[Cite as *Thompson Thrift Constr. v. Lynn*, 2017-Ohio-1530.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
|  |  | JUDGES: |
| THOMPSON THRIFT CONSTRUCTION | : | Hon. Patricia A. Delaney, P.J. |
|  | : | Hon. W. Scott Gwin, J. |
|  | : | Hon. William B. Hoffman, J. |
| Plaintiff-Appellant | : |  |
|  | : |  |
| -vs- | : | Case No. 16 CAE 10 0044 |
|  | : |  |
| SCOTT LYNN, ET AL | : |  |
|  | : | O P I N I O N |
| Defendants-Appellees | : |  |


CHARACTER OF PROCEEDING:       Civil appeal from the Delaware County
                                                        Court of Common Pleas, Case No.14 CVH
                                                        02 0077


JUDGMENT:                                    Affirmed in part; Reversed and Remanded
                                                        in part


DATE OF JUDGMENT ENTRY:        April 21, 2017


APPEARANCES:

For Plaintiffs-Appellants                    For Defendant-Appellee

MATTHEW BLICKENSDERFER           CHARLES KOENIG
3300 Great American Tower                 5354 North High Street
301 East Fourth Street                        Columbus, OH 43215
Cincinnati, OH 45202

*Gwin, J.,*

{¶1} Appellants appeal the September 12, 2016 judgment entry of the Delaware County Court of Common Pleas.

*Facts & Procedural History*

{¶2} The dispute in this case concerns a construction project at 801 Polaris Parkway, a 300,000 square foot extended-stay hotel. Appellant Thompson Thrift Construction, Inc. ("Thompson Thrift") was the general contractor on the project. Thompson Thrift entered into a $1,175,000 subcontract with Scott Lynn d/b/a National Framing & Finishing ("Lynn"), to provide all of the framing services for the project. Lynn had a $975,000, plus additional charges for any changes, subcontract with appellee Mark Hill d/b/a Mega Framing ("Hill") to provide labor services for the project.

{¶3} Hill employed carpenters that worked on the project from August to December of 2013. With each payment application Hill made, Hill signed a lien waiver. The last effective date of the lien waivers was December 13, 2013. In December of 2013, disputes arose between Thompson Thrift and Lynn. Lynn walked off the job and was terminated by Thompson Thrift. Hill continued working on the project for two additional pay periods through December 23, 2013. Subsequently, approximately fifteen to twenty carpenters previously employed by Hill continued work on the project through a temporary agency and then later through another individual who was working on the Polaris project.

{¶4} On January 6, 2014, Hill recorded a mechanic's lien against the property for $148,058.

{¶5} On February 3, 2014, Thompson Thrift filed a complaint against Lynn for breach of contract, unjust enrichment, conversion, and fraud.

{¶6} On March 11, 2014, Thompson Thrift filed a complaint against Hill/Mega. The complaint contained the application of Thompson Thrift for approval of a bond discharging the mechanic's lien of Hill and Mega Framing pursuant to R.C. 1311.11(C). Thompson Thrift sought approval from the trial court of a bond to discharge the mechanic's lien of Hill/Mega, the lien claimant, arising out of a contract between Thompson Thrift and Lynn, who subcontracted with Hill/Mega. On March 26, 2014, the trial court granted Thompson Thrift's application for discharge of mechanic's lien and substituted the mechanic's lien discharge bond issued by appellant Fidelity & Deposit Company of Maryland ("Fidelity") in the amount of $222,087.

{¶7} Hill filed a complaint against Lynn, Thompson Thrift, and Fidelity on June 30, 2014, including the following: an action on the surety bond against Fidelity, breach of contract claims against Lynn and Thompson Thrift, unjust enrichment claims against Lynn and Thompson Thrift, an intentional interference with contractual relations and business claim against Thompson Thrift, and a conversion claim against Lynn. Both Thompson Thrift and Fidelity filed answers to the complaint. On August 22, 2014, Hill filed a motion for default against Lynn, which the trial court granted on October 21, 2014.

{¶8} The above-cases were consolidated by the trial court. On November 5, 2015, Thompson Thrift and Hill filed an agreed entry. The agreed entry stated the cases would be heard by an arbitration panel consisting of three arbitrators, one selected by Thompson Thrift, one selected by Hill, and one selected by the trial court. The parties agreed they would have the right to appeal the findings of the arbitration panel as if the arbitration panel's decision were a magistrate's decision issued pursuant to Civil Rule 53. Lynn did not participate in the arbitration.

{¶9} The arbitration panel conducted a hearing beginning on February 15, 2016. Hill testified he has been in the framing business for thirty to thirty-five years and does high-end, specialized framing. Hill stated commercial framing requires unique skills because it is a "dangerous business" and the Polaris project was difficult because of inverted hangers and specialty items. Hill has a core group of carpenters and he recruited them over a period of time. Hill started the project in August of 2013 with fifteen laborers and ramped up the amount of laborers as needed.

{¶10} Hill testified the contract price he negotiated with Lynn was $975,000, plus retainage and additional charges for any changes made. Hill sent Lynn weekly invoices. Hill stated retainage is money taken out of each invoice that Lynn deemed necessary to get to the end of the job. Hill testified he was going to get paid the retainage amount at the end of the contract pursuant to his agreement with Lynn. Further, that the change orders amount of $80,514 was not billed to Lynn in the weekly invoices because it was agreed it would be calculated at the end of the job.

{¶11} Hill billed Lynn the total amount of $492,750, excluding retainage and change orders, and was paid $415,440. Lynn's last payment to Hill was on December 13, 2013. Hill billed additional amounts to Thompson Thrift after Lynn walked off the job in the amount of $37,800 on December 20th and $11,000 on December 23rd.

{¶12} Hill testified that on December 16, 2013, he attended a meeting with Lynn and Thompson Thrift executives in a trailer at the Polaris project site. Hill stated eight staff members of Thompson Thrift were present at the meeting scheduled for Lynn to rectify a forty-eight hour notice of correction. At the meeting, Lynn told Hill to get off the project. Hill testified he did not take his men off the project because he was summoned

back into the trailer by one of Thompson Thrift's people. Hill stated the Thompson Thrift staff members reassured him "we were going to work through this, and, yes, I would continue to get paid." Hill testified Thompson Thrift wanted him to complete the job and continue the motion of the project, so he and his men continued to work on the Polaris project. Lynn did not return to the project and did not communicate with Hill. Hill testified no one told him to stop working on the project after Lynn did not correct the items Thompson Thrift told him to correct.

{¶13} Hill worked during the week that ended on December 20th and sent the invoice for this period of time to both Lynn and Thompson Thrift. Exhibit C, the invoice for that week, lists the "outstanding unpaid invoices from 12/20/13" as $37,800. Hill testified he calculated the amount outstanding on this invoice by man hours and square footage of completion of the building. Further, that the building was approximately 55% completed at that point in time. Neither Lynn nor Thompson Thrift paid this invoice. Hill testified he asked Thompson Thrift to pay the invoice and, "they reassured me, keep my men building this project, I would get paid." Hill was surprised he was not paid by Thompson Thrift, but since Thompson Thrift said they would work it out, he continued working.

{¶14} Hill stated he worked until December 23, 2013 and could not go any further because he did not get paid. Hill told Lynn, Thompson Thrift, and all of his carpenters and laborers that he could not continue on the project without being paid. Hill invoiced Lynn and Thompson Thrift for December 20 through December 23rd (Exhibit E) for $11,000, the amount due since the last invoice. The invoice also stated the amount of extra work not in the contract was $80,514.

{¶15} Hill testified that Thompson Thrift told him they would talk about it after Christmas. Hill tried to negotiate with Thompson Thrift a successful conclusion of the project by completing the job with the money left in the draw. These negotiations went on from after Christmas until January 2nd or 3rd. Hill stated, "we were just negotiating the completion and the amount of money left on the contract." Hill testified the contract was half completed and his billing was based upon the amount completed of the project. Further, that when he submitted each invoice or bill, it contained the amount earned at that point.

{¶16} On January 2 or 3, Hill received a letter from Thompson Thrift dated December 26, 2013 informing him they were not going to continue to use him on the Polaris project. Hill immediately contacted his men to tell them and he found out Thompson Thrift approached them to complete the Polaris job without him. Hill testified eighteen to twenty of his men continued to work on the Polaris project and these were people Hill recruited and put together as a team. Hill stated since he lost his core carpenters, he could not go and bid other projects.

{¶17} Hill testified he could not just hire someone else to work on other projects because these workers are specialized, know the regulations, are highly-skilled individuals, and it would be dangerous to hire unskilled workers. Hill stated it takes years to formulate, get them together, and teach them your way of framing. Thus, he could not line up another project because he did not have these core employees.

{¶18} When Hill learned at the beginning of January that Thompson Thrift hired his employees, he filed a mechanic's lien on the Polaris property. Hill testified the mechanic's lien was not for the total amount he was owed because he did not have all

the change orders gathered up and his math was bad. Hill stated he was owed a total of $48,800 from Thompson Thrift for work he did after Lynn left the job, $77,310 in retainage, and $80,514 in change orders, in addition to the $148,058 amount he included in the mechanic's lien. Hill testified the project was tracking at a 17% profit and this was based upon the amount he was getting paid minus his expenses. Hill stated his retainage was going to be paid at the end of the project.

{¶19} Hill testified if he had been able to finish the contract, he would have been able to earn another $73,686. Further, that he could have finished the Polaris project, but was prevented from doing so when Thompson Thrift hired his core group of men. Hill stated Thompson Thrift's hiring of his employees caused Hill to lose the potential to make $73,686 in profit.

{¶20} When asked what his signing of lien waivers meant, Hill stated it meant he could not lien the property for the amount of the checks he received. Hill testified he was not waiving his right to receive retainage by signing the lien waivers and that the lien waivers did not cover the amount for change orders because he was told all the extras would be caught up at the end of the project. When Hill stopped working on the project, he put together an invoice for change orders. He had been compiling those numbers through the course of the project, though they were not in invoice form. Hill did not send Thompson Thrift or Lynn bills throughout the project for the change orders and extras, but testified they both knew about the extras.

{¶21} On cross-examination, Hill testified he does not have copies of the daily logs as he turned them in to Thompson Thrift. The daily logs were brief notes of what Mega Framing was doing each day. Hill does not have back-up documentation for the number

of man hours, other than his notes and pieces of paper he kept in his truck. Hill had these notes and pieces of paper with him when he compiled the invoices. Hill stated during cross-examination he did not have a contract with Thompson Thrift and he was talking about a new agreement with Thompson Thrift as of December 27, 2013.

{¶22} On re-direct, Hill testified he maintained records supporting his invoices during the Polaris project, but he then got rid of those records at the end of the job. Hill does not know what temporary agency hired his workers, but knows his workers were not available for him to use because they were working at 801 Polaris Parkway.

{¶23} Joshua Roshon ("Roshon") also testified at the arbitration hearing. Roshon is a carpenter and employee of Hill. Roshon stated the carpenters who work for Mega are experienced on large projects and it is the same group of ten to fifteen guys who do projects for Mega.

{¶24} With regards to the Polaris project, Roshon testified when Hill told them to stop working, Thompson Thrift had a meeting with the guys to go back to work on the Polaris project. The meeting was held at Thompson Thrift's job trailer at the Polaris project site. Roshon stated he, approximately ten other guys who worked for Mega, and Thompson Thrift's guys were at the meeting. Roshon testified that, at the meeting, Thompson Thrift told them they wanted them to come work for them on the Polaris project.

{¶25} Roshon was not directly hired by Thompson Thrift, but Thompson Thrift had them sign on with a temporary agency and later with Bill Hahn. Roshon testified Thompson Thrift asked them to do this so they did not have to do the paperwork. When he worked for the temporary agency and Hahn, Thompson Thrift provided the tools Roshon used and provided direction for the project. Further, when he worked for the

temporary agency and Hahn, Thompson Thrift determined the makeup of the crews and inspected their work.

{¶26} Roshon only worked for the temporary agency for a few weeks and then got paid through Bill Hahn. Roshon told Hill they were back on the Polaris job. Roshon testified approximately fifteen to twenty former Mega carpenters were working on the Polaris project after Hill left and the same individuals who were working on the Polaris project in 2013 were the same ones working on the Polaris project in 2014, except for Hill. Roshon testified he was there until the framing was substantially completed. Roshon stated that after the framing was completed at the Polaris project, the majority of the carpenters went back to Mega.

{¶27} Zachary Divine ("Divine") testified at the arbitration hearing. Divine is a preconstruction project engineer with Thompson Thrift and, while the Polaris project was going on, he was an estimator on the project. Divine was phased off the Polaris project to another project in Arkansas in May of 2013. Divine returned the Polaris project in April of 2014. Divine valued the work performed by Mega and Hill after December 13, 2013 at $7,800.

{¶28} Divine testified Thompson Thrift paid Lynn $578,644.62. In reviewing the contract between Thompson Thrift and Lynn, Divine testified it states that if a subcontractor fails to perform work in a timely manner, Thompson Thrift has the right to take over the work and there is no restriction in the contract on hiring other people. Divine does not know of any time when Thompson Thrift entered into an agreement with Hill. Divine stated Thompson Thrift did not have an agreement with Hill because Hill was not

meeting production rates, not providing adequate manpower, and not completing the work on time.

**{¶29}** On cross-examination, Divine testified he is not aware of the work performed by Hill/Mega during the periods covered by the December 20th and December 23rd invoices because he was not on-site when the work was being performed. Divine testified Hill/Mega were involved in the Polaris project from June of 2013 to December of 2013 and he was off the Polaris project at that time.

**{¶30}** Divine has never seen a contract between Thompson Thrift and Hill or Mega and he would know about such a contract because Thompson Thrift keeps these types of documents. Divine testified if a Thompson Thrift employee entered into an oral contract with a subcontractor, he would not know about it, but it would be very, very unusual for this to happen.

**{¶31}** Divine testified Thompson Thrift put up with problems from Lynn and Hill for several months because it is difficult to find framers to work on a project of this complexity and there are limited resources. Divine stated the framers from Mega were independent contractors who willingly made the decision to go work for other subcontractors that Thompson Thrift hired. Divine was not aware that the carpenters from Mega were employed by a temporary agency in January of 2014. Divine stated Thompson Thrift does not typically use temporary agencies for large scopes of work and usually used them only for site cleanup and small tasks.

**{¶32}** Divine believes Hill has been paid in excess of the value he provided. Divine cannot tell the magnitude of Hill's mistakes because Hill submitted no backup documentation. Divine does not know what amount of framing was performed by National

or Mega, but it was not 55%. Divine could not determine all the work that Hill/Mega completed and exactly when the work was in place, but when he returned to the Polaris project in April of 2014, they were still doing things that were listed as substantially complete in December. Divine never saw communications or discussed with anyone hiring Mega's former workers at a temporary agency.

{¶33} The arbitrators issued a decision on April 28, 2016. As to Hill's breach of contract claim against Thompson Thrift, the arbitrators concluded there was a promise made by Thompson Thrift to Hill to work in December of 2013 and that Thompson Thrift would pay Hill for this work. Thus, there was an oral contract between Thompson Thrift and Hill. Further, that Hill incurred costs of $48,800 based upon the invoices he submitted of $37,800 and $11,000. The arbitrators found for work prior to December 13, 2013, the amount was either subject to lien waivers or not due and owing from Thompson Thrift to Hill. The arbitrators denied Hill's unjust enrichment claims against Thompson Thrift.

{¶34} With regards to Hill's tortious interference claim, the arbitrators found the evidence established that Thompson Thrift sought employees and independent contractors under the employment of Hill and Thompson Thrift encouraged these employees to work through a temporary agency and through Hahn. The arbitrators found Thompson Thrift interfered with Hill's ability to conduct business and thus Hill established his tortious interference claim.

{¶35} As to damages for tortious interference, the arbitrators noted Hill sought $73,686.50 in lost profits on his claim based upon the remaining amount of work to be performed on the subcontract the time of his termination in the amount of $433,450 and Hill's testimony that his profit margin was 17%. However, the arbitrators found the

testimony at the arbitration hearing was that not all the employees who used to work for Hill worked until the end of the project.  While they worked more than half of the time between Hill's cessation of services and the completion of the project, there was not conclusive evidence that all the workers worked until the end of the Polaris project.  The arbitrators found Hill proved his former employees/independent contractors worked at least half of the time between Hill stopping work and the completion of the project, so Hill was entitled to recover half of his lost profits, $36,843.25, on his tortious interference claim.  Further, the arbitrators found Hill was entitled to attorney fees for the intentional nature of the tortious interference.  The arbitrators ordered Hill to provide an itemized statement of attorney fees and allowed Thompson Thrift to respond or object to the itemized statement.

{¶36}  As to Hill's claims on the mechanic's lien bond, two of the arbitrators found Hill's liability on the bond is only in connection with the lien.  These arbitrators determined Fidelity is released from liability for Hill's claims because of the unconditional lien waivers Hill signed through December 13, 2013 and the balance that was due and owing to Hill after December 13, 2013 ($48,800) was pursuant to a separate contract with Thompson Thrift for which Hill is recovering directly from Thompson Thrift.  Thus, further recovery under the bond would be double recovery.  The two arbitrators found the lien waivers do not preclude the rights of Hill to retainage.

{¶37} The arbitrators determined since the trial court already awarded Hill damages of $148,058 on his unjust enrichment claim against Lynn, Hill is entitled to $86,829.20 from Lynn, the difference between the contract price and the amount paid by Lynn to Hill, times its profit.  Further, Hill is entitled to change orders in the amount of

$80,514 and retainage of $77,310. The arbitrators also awarded Thompson Thrift $877,634.29 against Lynn.

**{¶38}** A dissenting arbitrator found Fidelity failed to raise lien waiver as an affirmative defense and thus waived the defense. Further, that mechanic's lien statutes are to be liberally construed in favor of lien claimants and the "valid claim" in the discharge bond statute means either the amount in the mechanic's lien affidavit for unpaid construction services or that the mechanic's lien was timely and in compliance with the statutory requirements. The dissenting arbitrator found there is no issue as to the validity of the mechanic's lien. Accordingly, the dissenting arbitrator found Hill was entitled to the following amounts from the discharge bond: $77,310 in retainage, $80,514 for change orders, and $91,600 for the remainder of the framing subcontract.

**{¶39}** Hill objected to the arbitrator's decision as to the recovery on the bond. Thompson Thrift filed amended objections to the arbitrator's decision on April 29, 2016. Thompson Thrift objected to the arbitrators' finding that there was an oral contract between Hill and Thompson Thrift because the evidence and testimony at the arbitration hearing was insufficient to establish the elements of a contract action. Thompson Thrift also objected to the arbitrators' finding of breach of contract because the evidence failed to establish damages with reasonable certainty.

**{¶40}** As to the tortious interference claims, Thompson Thrift objected to the arbitrators' determination Hill proved his tortious interference claim. Thompson Thrift argued since Hill's crew consisted of independent contractors, he could not recover on a tortious interference claim and, since these employees were terminable at will by Hill, there was no tortious interference. Further, that normal competition is privileged.

Thompson Thrift also argued there is no evidence they hired any member of Hill's crew. Finally, Thompson Thrift contended Hill failed to prove damages for tortious interference with reasonable certainty.

{¶41} The trial court issued a judgment entry on September 12, 2016. The trial court found there was evidence an oral contract was formed between Hill and Thompson Thrift as Hill testified about the meeting with Thompson Thrift and to Thompson Thrift's assurances he would continue to get paid. As to Hill's testimony that he did not have a contract with Thompson Thrift, the trial court found Hill's testimony was that he did not have a written contract with Thompson Thrift. However, Hill's testimony clearly showed he had an understanding that he had an agreement with Thompson Thrift to continue to work and he would be paid. Further, that Thompson Thrift did not present any evidence to contradict Hill's testimony as Divine was not present at the meeting. The trial court found Hill's unsuccessful attempts to negotiate a contract directly with Thompson Thrift after stopping work on December 23rd was not evidence a prior oral contract did not exist. The trial court overruled Thompson Thrift's objection and found the evidence established an oral contract between Hill and Thompson Thrift for Hill to continue work from December 16, 2013 to December 23, 2013.

{¶42} The trial court found Hill presented invoices in the amounts of $37,800 and $11,000 and this was sufficient documentation of the work performed and damages due and owing on the breach of contract claim. The trial court stated the lack of back-up documentation does not invalidate the amount on the invoices as Hill testified he kept time records but got rid of the records when the job was completed. Accordingly, the trial court found it was reasonable to presume the invoices were based on the time records

Hill kept at the time of the project. The trial court stated Hill's inability to recall details of completion percentages of sheathing for specific pod sections does not affect his credibility and does not serve to question the accuracy of the invoices. Further, that any lien waivers executed prior to December 13th are not relevant to the determination of damages for a breach of contract in a subsequent timeframe. The trial court overruled Thompson Thrift's objections to the amount of damages on the breach of contract claim.

{¶43} The trial court found the evidence supports Hill's claim against Thompson Thrift for tortious interference with business relations as Thompson Thrift interfered with prospective contractual relations Hill would have had with his workers. The trial court determined Hill clearly had a business relationship with his workers as he testified it takes years to formulate a group and teach them your framing method. Further, that Thompson Thrift was aware of the relationship between Hill and his employees as Divine testified it is hard to find framers to work on a project of this complexity. The trial court noted Roshon testified he worked for Hill and Thompson Thrift contacted him for a meeting where he was asked to work for Thompson Thrift on the project and was directed by Thompson Thrift to be hired through a temporary agency and Hahn. The trial court concluded Thompson Thrift contacted and hired Hill's workers through a temporary agency and Hahn which intentionally interfered with the business relationship Hill had with his skilled carpenters. Further, that Thompson Thrift presented no evidence to the contrary.

{¶44} The trial court found this is not a case where fair competition provided Thompson Thrift with a justification for its interference as Thompson Thrift, a general contractor, is not in competition with framing subcontractors like Hill. Further, there is no evidence or argument that Thompson Thrift is in the general practice of competing with

others to employ skilled workers for framing. The trial court found even if Hill and Thompson Thrift were competitors, Thompson Thrift's actions would not be proper because the purpose of recruiting workers was not in any part to advance its interest in competing with Hill.

{¶45} The trial court overruled Thompson Thrift's objections as to the tortious interference claim and modified the arbitration order to clarify that Hill established a claim for tortious interference with a business relationship, not tortious interference with a contract.

{¶46} The trial court also overruled Thompson Thrift's objections to the damages for tortious interference. The trial court noted the arbitrators only awarded Hill half of the lost profit amount he was seeking since not all the workers worked until the end of the project. The trial court found there was sufficient evidence of damages through Hill's testimony of $73,686.50 in lost profits and his testimony that his profit margin was 17%, an amount which he had records available for when he calculated his profit margin. Further, that the evidence demonstrated Thompson Thrift needed to utilize Hill's skilled workers.

{¶47} As to the bond claim against the surety, the trial court found since it granted judgment for Hill on his breach of contract claim against Lynn and the arbitrators awarded damages on that claim against Lynn, the damages awarded are properly secured by the mechanic's lien and the discharge bond. The trial court found Fidelity did not raise lien waiver as an affirmative defense, so Fidelity waived this defense and the full amount of Hill's claim against Lynn for breach of contract and Thompson Thrift is secured by the bond. Further, even if the lien waiver defense had not been waived, the arbitrators

correctly concluded the lien waivers would not impact Hill's right to retainage ($77,310) or his right to collect for change orders ($80,514.11). Finally, the trial court found there was no lien waiver signed for the work performed under the oral contract with Thompson Thrift for $48,800.

{¶48} The trial court sustained Hill's objection as to his recovery on the surety bond and granted judgment in favor of Hill against Fidelity on the bond for the amount awarded against Thompson Thrift for breach of contract for $48,800 and Lynn in the amount of $244,653.20.

{¶49} The trial court entered judgment: in favor of Hill against Thompson Thrift on his breach of contract claim for $48,800; in favor of Hill against Thompson Thrift on his intentional interference with business relations claim in the amount of $36,843.25, plus attorney fees of $16,852; in favor of Hill against Lynn for breach of contract and conversion in the amount of $244,683.20; in favor of Thompson Thrift against Lynn for $877,634.29; and in favor of Hill against Fidelity on the bond.

{¶50} Appellants appeal the September 12, 2016 judgment entry of the Delaware County Court of Common Pleas and assign the following as error:

{¶51} "I. THE TRIAL COURT ERRED IN PERMITTING HILL TO RECOVER ANYTHING AGAINST THE LIEN DISCHARGE BOND.

{¶52} "II. THE TRIAL COURT ERRED IN FINDING AN ORAL CONTRACT AND AWARDING DAMAGES ON THAT ALLEGED CONTRACT.

{¶53} "III. THE TRIAL COURT ERRED IN FINDING THOMPSON THRIFT TORTIOUSLY INTERFERED WITH HILL'S BUSINESS RELATIONS AND IN AWARDING DAMAGES FOR TORTIOUS INTERFERENCE.

**{¶54}** "IV. THE TRIAL COURT ERRED IN AWARDING ATTORNEY FEES."

**{¶55}** The parties agreed in this case they would have the right to appeal the findings of the arbitration panel to the trial court as if the arbitration panel's decision were a magistrate's decision issued pursuant to Civil Rule 53.

**{¶56}** In reviewing objections to a magistrate's decision, Civil Rule 53 instructs the trial court to conduct an independent review of the facts and conclusions contained in the magistrate's report and enter its own judgment. *Kolano v. Kolano*, 5th Dist. Tuscarawas No. 2014AP060026, 2015-Ohio-1369. Thus, the trial court's standard of review of a magistrate's decision is de novo. *Id.* However, "[w]hen a court of appeals reviews the decision of a trial court overruling or sustaining objections to a magistrate's decision, the standard of review is abuse of discretion. *Id.* An abuse of discretion connotes that the court's attitude was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

I.

**{¶57}** In their first assignment of error, Thompson Thrift and Fidelity contend the trial court erred in permitting Hill to recover anything against the lien discharge bond.

**{¶58}** On January 6, 2014, Hill recorded a mechanic's lien against the property for $148,058. The trial court subsequently discharged the lien pursuant to R.C. 1311.11(C)(1) upon approval of an application by Thompson Thrift and upon approval of a lien discharge bond issued by Fidelity.

*Recovery on the Bond*

**{¶59}** The trial court found the full amount of Hill's claim against Lynn for breach of contract, including the amounts for retainage and changes orders, and against

Thompson Thrift for breach of contract, were secured by the bond. Thompson Thrift and Fidelity argue since Thompson Thrift is the bond's principal, not Lynn, Hill cannot recover against the bond for any monies due and owing from Lynn.

{¶60} R.C. 1311.11 delineates the procedure used to remove a mechanic's lien from its record of title. R.C. 1311.11(C) provides a procedure under which a mechanic's lien can be declared void even before the lienholder has been compelled to commence an action on the underlying dispute, as it allows for the lien to be replaced by a bond. "As of the date of the entry of approval, the security of the bond * * * shall be substituted for the security of the lien, and the lien is void and the property is wholly discharged from the lien." *Id.*

{¶61} Since the bond is viewed as a substitute for the lien, it follows the surety on the bond steps into the "shoes" of the principal. *A&J Plumbing, Inc. v. Huntington Nat'l Bank*, 11th Dist. Lake No. 2014-L-023, 2014-Ohio-5707. Thus, Fidelity, the surety on the bond, steps into the "shoes" of Thompson Thrift. Fidelity cannot be liable on a bond that replaces an invalid lien, but can be held responsible as surety where the bond released a valid lien. *Midwest Curtainwalls, Inc. v. Pinnacle 701, LLC*, 8th Dist. Cuyahoga No. 92269, 2009-Ohio-3740. Thus, if a mechanic's lien was invalid, the surety cannot be held responsible to pay on the bond. *A&J Plumbing, Inc. v. Huntington Nat'l Bank*, 11th Dist. Lake No. 2014-L-023, 2014-Ohio-5707. In this case, neither Thompson Thrift nor Fidelity argued that Hill's mechanic's lien was invalid or that Lynn did not breach his contract with Hill. Rather, they contend Hill cannot recover against the bond for any amount due and owing from Lynn.

{¶62} Thompson Thrift and Fidelity contend Hill recognized this issue at the trial court level when he objected to the trial court's granting of the bond and argued that Thompson Thrift was the wrong party to be putting up the bond. However, in its response to Hill's motion, Thompson Thrift argued Hill/Mega was "incorrect in its assertions" and "while Mega is being represented by its owner, pro se, it should be clear to Mega that its claim is fully secured and that its grounds for reconsideration are not valid."

{¶63} In this case, Thompson Thrift filed with the trial court an application for approval of bond to discharge the mechanic's lien on the property. The application specified that the bond was "to discharge a mechanic's lien filed by Mega Framing ("Lien Claimant"), arising out of a contract between applicant and National Framing and Finishing, who subcontracted with the lien claimant." Attached to the application was a surety bond issued by Fidelity.

{¶64} The surety bond provides that Thompson Thrift is the principal on the bond and Fidelity is the surety. Further, that the Obligee (Hill) has filed an affidavit for mechanic's lien in the amount of $148,058 and that the principal desires that the mechanic's lien shall be void and the real property shall be wholly discharged from such lien by giving of the bond. The bond provides, "* * * if the Court shall adjudge and decree Obligee's claim as a valid claim and the sum for which Obligee is awarded judgment by the Court, plus costs, shall be paid, or if judgment shall be rendered against Obligee on its claim, then this obligation shall be void, otherwise to be in full force and effect."

{¶65} A subcontractor can file a mechanic's lien to secure payment for work or labor or material in furtherance of any improvement undertaken by virtue of a contract, express or implied. R.C. 1311.02. R.C. 1311.11(C) merely establishes a substitution of

bond or deposit to take the place of the lien on the real estate, thereby clearing title to the real estate. *In re Mechanics' Lien of Whitta*, 7 Ohio App.3d 153, 454 N.E.2d 953 (3rd Dist. 1982).

**{¶66}** Here, the application for the bond specifically stated it was to be substituted for the security of the lien that was filed by Mega Framing arising out of a contract between applicant and National Framing. Thus, the plain language of the application to the trial court makes it clear the lien Thompson Thrift sought to discharge with the bond was the lien that included unpaid sums from Lynn to Hill and was based upon the contract between Lynn and Hill. There is nothing in the application or in the bond that limits Hill's recovery to "claims" only against Thompson Thrift or that specifies the application and/or bond only guaranteed the obligations of Thompson Thrift, rather than those of Lynn. Further, the mechanic's lien encumbers the project, not a particular person.

**{¶67}** Since we find the trial court did not err in finding Hill can recover against the bond for monies due and owing from Lynn, we must now examine whether any of these amounts were subject to lien waivers signed by Hill.

*Lien Waivers*

**{¶68}** Thompson Thrift and Fidelity argue the lien waivers executed by Hill barred any recovery for services rendered on or prior to the effective date of the lien waiver. On December 3, 2013, Hill signed a "Partial Unconditional Waiver of Lien." The waiver provided that Mega/Hill has, pursuant to an agreement with National Framing, furnished certain materials, equipment, services, and/or labor for the project known as Polaris Parkway and located at 801 Polaris Parkway in Columbus, Ohio. The waiver further stated that in consideration of $22,000, Mega/Hill:

* * * hereby waives and release any and all liens or rights of liens against the Contractor, the owner of the Project ("Owner"),the Project and the improvements located thereon or any right against any labor and/or material payment bond it has or may have on account of any and all materials, equipment, services, and/or labor furnished for or in connection with the Project through the date of 11/29/13 ("Effective Date"), represents and warrants to Contractor and Owner that no other person or party has any right to a lien or claim on account of any materials, equipment, services, and/or labor furnished by, to or through the Subcontractor or Supplier, on or before the Effective Date, and agrees to indemnify, defend, and hold the Contractor and Owner harmless from and against any and all liabilities, losses, costs, expenses, including attorney fees, by reason of claims or liens for any materials, equipment, services, and/or labor furnished for or in connection with the Project by, through or to the Subcontractor or Supplier prior to the Effective Date.

{¶69} Hill signed a second "Partial Unconditional Waiver of Lien" identical to the December 3rd wavier on December 13, 2013. However, the consideration amount listed on the second wavier was $20,000 and the effective date of the second wavier was December 13, 2013.

{¶70} It is a well-known element of the mechanic's lien law in Ohio that a mechanic's lien, or the right thereto, may be waived by express agreement. *J.J. Hammond Co. v. Jent Construction, Inc.*, 10th Dist. Franklin No. 74AP-19, 1974 WL 184150 (May 28, 1974); *Portsmouth Iron Co. v. Murray*, 38 Ohio St. 323 (1882). In

general, common words appearing in a written instrument will be given their ordinary meaning unless a manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978).

**{¶71}** Hill argues since the lien waivers only had Lynn's (National Framing's) name on them, they only applied to him, not Thompson Thrift or Fidelity. Similar to our rationale in finding the application for discharge bond and the bond itself applied to Thompson Thrift, we find the plain language of the waiver did not limit the waiver to Lynn's claims only. Rather, it released any and all liens or rights of liens against Lynn, the owner of the project, the project itself, and the improvements located thereon, or any rights against any labor and/or material payment bond it has or may have.

**{¶72}** The trial court awarded Hill a total of $244,653.20 from the bond based upon his breach of contract claim against Lynn. The amount is comprised of $77,310 in retainage and $80,514.11 for change orders. The balance of the award was based upon labor performed and materials furnished in performing improvements to the realty, for which Hill was not paid prior to Lynn's leaving the job on December 16, 2013.

*Retainage & Change Orders*

**{¶73}** Thompson Thrift and Fidelity contend the lien waivers apply to Hill's recovery for retainage and change orders because the lien waivers were unconditional and waived and released "any and all claims or rights of liens" prior to the effective date. We disagree with appellants.

**{¶74}** The plain language of the waivers states that payment has been received in consideration of wavier of all claims to the property up to their respective specified

dates, the latest being December 13, 2013. However, Hill did not have a claim for retainage and/or change orders on or before December 13, 2013 because these amounts were not yet due on December 13, 2013 since Hill was still working on the Polaris project.

{¶75} The specifications regarding the payment of retainages to subcontractors is governed by statute and by the parties' contract. R.C. 4113.61(A)(2) permits the withholding of retainages from draw requests of lower tier subcontractors, but R.C. 4113.61(A)(3) then requires the contractor to pay those retainages to the subcontractor within ten days after receipt of final payment from the owner or within the time period provided in a contract, whichever is shorter. The contract between Hill and Lynn provides for retainage of 10% and states the retainage was to be paid on a building-by-building basis and paid when the building passed inspection. The contract between Lynn and Thompson Thrift specified retainage would be withheld from all subcontractors and would be released within 120 days of completion of the subcontractor's scope of work.

{¶76} It is clear from the contracts in evidence that it is standard in the construction industry to provide partial lien waivers prior to receipt of payment on draw requests and for retainage to be released once the subcontractor finished its work. Additionally, Hill testified about retainage and stated it is money taken out of each invoice Lynn deemed necessary to get to the end of the job. Further, that he was going to be paid retainage at the end of the project pursuant to his agreement with Lynn. Thus, retainage was not covered by the lien waivers because Hill's claim for retainage had not yet accrued as of December 13, 2013.

{¶77} As to change orders, Hill testified when he negotiated his contract with Lynn, it was for the contract price, plus retainage and change orders. Further, that the change

order amount of $80,514 was not billed to Lynn in the weekly invoices Hill submitted because it was to be calculated at the end of the job. Hill entered into evidence his written notes and typed breakdown of the change orders and extras not included in the contract totaling $80,514 and testified the total of $80,514 was the correct amount for change orders not included in the contract. Hill testified he put together the invoice for the change order amounts when he stopped working on the project, but he had been compiling these numbers through the course of the project. Hill stated he did not bill Thompson Thrift or Lynn for change orders throughout the project, but testified both Lynn and Thompson Thrift knew about these extras.

{¶78} Thompson Thrift presented no evidence disputing Hill's testimony that he expended labor and materials on change orders or his testimony that they knew about the extras and agreed to reconcile this obligation at the end of the project. When a subcontractor performs extra work on an improvement to real property, it may include such extra work on its lien claim. *Dunn & Witt v. Rankin & Co.*, 27 Ohio St. 132 (1875). There is no provision in the Ohio mechanic's lien act that requires a signed change order before a contractor can recover for extra labor and materials and a party's verbal instructions creates a constructive change order that is a proper basis to allow recovery of additional costs. *Midwest Curtainwalls, Inc. v. Pinnacle 701, LLC,* 8th Dist. Cuyahoga No. 92269, 2009-Ohio-3740.

{¶79} Thompson Thrift and Fidelity argue Hill cannot recover the amounts for retainage and change orders because these amounts were not specifically included in the lien amount as Hill testified he forgot to include the amounts for retainage and change orders in the original lien amount. Courts have held that a lien is not invalidated if the

stated amount is incorrect when the lienholder testifies to the amount of the lien. *In re Qualstan Corp.*, 303 B.R. 149 (Bankr. S.D. Ohio 2003); *Thomas v. Huesman*, 10 Ohio St. 152 (1859); *Tucker Construction, Inc. v. Kitchen*, 9th Dist. Summit No. 16636, 1995 WL 89431 (March 1, 1995). In this case, Hill testified he forgot to include the amount for the change orders and retainage in the lien and specifically testified those amounts were due.

**{¶80}** Accordingly, we find the trial court did not err in finding Hill is entitled to recover the amounts for the change orders and retainage against the bond.

*Amount for Breach of Contract against Lynn*

**{¶81}** The trial court found Hill could recover from the bond the balance (separate from retainage and change orders) of the breach of contract award against Lynn. This amount was based upon labor performed and materials furnished in performing improvements to the realty, for which Hill was not paid prior to Lynn's leaving the job on December 16, 2013. Hill testified when he submitted these invoices, the labor for each invoice had already been completed and the materials had been expended. Thus, when the invoices were submitted, the amounts on them were due and owing.

**{¶82}** We find the labor and materials were covered by the lien waivers since they were due and owing prior to December 13, 2013. Accordingly, we find the trial court erred in awarding Hill the amount against the bond for Lynn's breach of contract, independent of the amount for retainage and change orders.

*Amount for Breach of Contract against Thompson Thrift*

**{¶83}** The trial court found Hill could recover from the bond the $48,800 on its breach of contract claim against Thompson Thrift. We first note that the lien waivers do

not apply to this claim because the amounts due pursuant to Thompson Thrift's breach were incurred after the date of the latest lien waiver on December 13, 2013.

**{¶84}** However, as discussed below, the balance due and owing to Hill from Thompson Thrift after December 13, 2013 is pursuant to a separate oral contract between Thompson Thrift and Hill that was made when Thompson Thrift approached Hill to continue on the project and assured him he would be paid. In appellant's second assignment of error, we find that Hill is entitled to recover on his breach of contract action directly against Thompson Thrift. If Hill was permitted to also recover $48,800 from Fidelity on the bond, Hill would be recovering the $48,800 twice. Hill's recovery from Fidelity is thus precluded by his recovery on the breach of contract claim directly from Thompson Thrift. See *Kindle Rd. Co. v. Trickle*, 5th Dist. Licking No. 03CA99, 2004-Ohio-4668.

**{¶85}** Accordingly, we find the trial court erred in finding Hill could recover against Fidelity on the bond for Thompson Thrift's breach of contract, as Thompson Thrift is directly liable for the $48,800 amount.

*Waiver of Affirmative Defense*

**{¶86}** Hill contends Fidelity waived the defense of lien waiver by failing to plead this affirmative defense in it answer to Hill's complaint. The trial court concluded Hill was correct in this assertion. Hill argues this is evidenced by the fact that Thompson Thrift's answer specifically stated Hill's claims were "barred, in whole or in part, by lien/claim waivers" signed by Hill, while Fidelity only stated Hill's "claims are barred by the doctrine of waiver."

**{¶87}** Civil Rule 8(B) provides a defendant, "shall state in short and plain terms of the party's defenses to each claim asserted and shall admit or deny the averments upon which the adverse party relies." *Jim's Steak House, Inc. v. City of Cleveland*, 81 Ohio St.3d 18, 1998-Ohio-440, 688 N.E.2d 506. As this Court has previously stated, pursuant to the liberal pleading requirements of Civil Rule 8, the pleadings of the parties to an action need only be in general terms. *New Lexington City School Dist. Bd. of Education v. Muzo Investment Group*, 5th Dist. Perry No. 15-CA-00012, 2016-Ohio-1338. Further, a defendant's answer is subject to the same notice-pleading standards as a plaintiff's complaint, and an affirmative defense is generally adequate as long as the plaintiff receives fair notice of the defense. *Id.*

**{¶88}** In this case, Fidelity expressly pled the general term of "waiver" as an affirmative defense in its answer. Additionally, there is no evidence Hill did not receive fair notice of this defense. Hill included in his pre-trial statement as a contested issue of law, "whether any lien waiver executed by Hill is unenforceable as a result of the conduct of Lynn and/or Thompson Thrift." Hill also asserted in his trial brief any lien waivers he executed were obtained under duress and/or due to misrepresentation. Further, the parties argued the issue of lien waivers at the arbitration hearing. Pursuant to the notice pleading requirements in Ohio, we find Fidelity's general assertion of the affirmative defense of "waiver" was sufficient in this case where Hill was not surprised or prejudiced by the lien waiver argument and the issue was argued by both side throughout the proceedings.

**{¶89}** Accordingly, we find the trial court erred in its determination that Fidelity waived the defense of lien waiver.

{¶90} Based on the foregoing, we overrule Fidelity and Thompson Thrift's first assignment of error in part and sustain their first assignment of error in part.

II.

{¶91} In its second assignment of error, Thompson Thrift argues the trial court erred in finding an oral contract existed and in awarding damages on this alleged oral contract. In order to succeed on a breach of contract claim, Hill must demonstrate: (1) a contract existed; (2) Hill fulfilled his obligations; (3) Thompson Thrift breached its obligations; and (4) damages resulted from the breach. *Caley v. Glenmoor Country Club, Inc.*, 5th Dist. Stark Nos. 2013 CA 00012, 2013 CA 00018, 2013-Ohio-4877.

{¶92} First, Thompson Thrift contends the evidence does not support the finding of an oral contract between Thompson Thrift and Hill. Thompson Thrift points to Hill's testimony that he did not have a contract with Thompson Thrift and his testimony that he was seeking a contract with Thompson Thrift.

{¶93} As an appellate court, we are not fact finders; we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent, and credible evidence upon which the fact finder could base his or her judgment. *Peterson v. Peterson*, 5th Dist. Muskingum No. CT2003-0049, 2004-Ohio-4714. The elements of a contract include the following: an offer, an acceptance, contractual capacity, consideration, a manifestation of mutual assent, and legality of object and of consideration. *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58.

{¶94} We find there is competent and credible evidence to support the trial court's determination that there was an oral contract between Thompson Thrift and Hill for the

period of December 16th through December 23rd. Hill testified at the meeting in the trailer at the Polaris jobsite, Thompson Thrift executives summoned him back into the trailer after Lynn left and reassured him that "we are going to work through this and yes, I would continue to get paid." Hill stated Thompson Thrift wanted him to complete the Polaris framing job. Hill testified that when he asked Thompson Thrift to pay the first invoice, Thompson Thrift assured him that if he kept his men building the Polaris project, Hill would get paid. Hill stated he continued to work on the project because Thompson Thrift said they would work it out.

{¶95} While Thompson Thrift offered the testimony of Divine who stated he never saw a contract between Hill and Thompson Thrift and employees of Thompson Thrift making an oral contract with a subcontractor would be very unusual, it is up to the trial court to determine the credibility of the witnesses and weigh the evidence. Further, Divine was not present at the meeting between Hill and Thompson Thrift executives. Additionally, Divine testified he was not aware of the work performed by Hill/Mega covered by the December 13th and 20th invoices because he was not on site when the work was performed; Divine was on a different project in Arkansas from May of 2013 through April of 2014.

{¶96} Thompson Thrift argues the trial court inappropriately ignored the testimony of Hill that he did not have a contract with Thompson Thrift. We again note it is up to the trial court to determine the credibility of the witnesses and weigh the evidence. Further, the trial court did not abuse its discretion in analyzing Hill's testimony in the context of the questioning and finding Hill was referring to a written contract.

**{¶97}** Thompson Thrift contends Hill's testimony about negotiating with Thompson Thrift demonstrates there was no contract between Thompson Thrift and Hill. However, Hill testified he tried to negotiate with Thompson Thrift from after Christmas until January 2nd or 3rd for a successful conclusion to the Polaris project by using the money left in the draw. Hill stated, he was "just negotiating the completion and amount of money left on the contract." Thus, there is competent and credible evidence that Hill's negotiations were for the time period after December 23rd and these negotiations did not invalidate the oral contract covering the dates of December 16th through December 23rd.

**{¶98}** Thompson Thrift also argues that even if the evidence presented supports a finding of an oral contract, the trial court erred in awarding Hill damages for breach of contract because Hill failed to prove damages to a reasonable certainty. Specifically, Thompson Thrift alleges Hill failed to provide documentation to support his invoices. Further, Thompson Thrift argued in its objection to the arbitrator's decision that Hill failed to prove his breach of contract damages because he failed to include in his calculations the amount for charges that were to be taken out of his contract for expenses such as tools/nails, drywall work, jacks, and supplemental labor.

**{¶99}** An appellate court reviews a lower court's decision in regards to damage calculations under the competent, credible evidence standard. *C.E. Morris Co. v. Foley Construction*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978). A reviewing court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the judgment rendered by the trial court. *Id.*

**{¶100}** Damages for breach of contract "are those which are the natural or probable consequences of the breach of contract or damages resulting from the breach that were

within the contemplation of both parties at the time of the making of the contract." *Campbell. Hospitality, Inc. v. Shinn*, 5th Dist. Licking No. 02-CA-104, 2003-Ohio-5165. Damages for breach of contract must be proven with reasonable certainty. *Id.*

{¶101} In this case, we find there is competent and credible evidence to support the trial court's determination of breach of contract damages. As detailed above, the oral contract covered the period from December 16th to December 23rd of 2013. Hill presented two invoices for the services he provided to Thompson Thrift during this period, Exhibits C and E. Hill testified Thompson Thrift did not pay either of these invoices. Hill stated on Exhibit C and Exhibit E, the $37,800 amount and $11,000 amount were the correct amounts due to him from Thompson Thrift for work done during those periods of time. Hill testified the invoices included more than just lineal feet and man-hours in the calculations. Hill stated his billing was based upon the amount of completion of the project and, when he submitted each invoice, it contained the amount he had earned at that point.

{¶102} Hill testified he was owed $48,800 from Thompson Thrift for work he did after Lynn left the job. While Hill does not have back-up documentation for the number of man hours contained in the invoices, Hill testified he did have such documentation with him when he compiled the invoices. Hill stated he maintained the records supporting the invoices during the project, but got rid of them at the end of the job. The lack of back-up documentation does not invalidate the amounts in the invoices in light of Hill's testimony. Further, while Divine opined the value of the work Hill did from December 16th to December 23rd was $7,800, Divine admitted he was not aware of the work performed by Hill/Mega covered by the two invoices because he was not on site when the work was performed.

{¶103} Additionally, as noted by the trial court, any deductions for expenses such as equipment rental, nails, tools, and damage were deductions that were to be made pursuant to Hill's contract with Lynn, not pursuant to the oral contract with Thompson Thrift. Further, there is no evidence in the record that Hill failed to fully perform the contract for work between December 16th and December 23rd. Thus, Hill did not realize any savings in the form of expenses for additional materials and additional labor hours due to Thompson Thrift's breach because, at the time Hill submitted the invoices, they contained the amount he had already earned at that point. See *Smith v. Allio*, 5th Dist. Stark No. 2009 CA 00314, 2010-Ohio-5738.

{¶104} We find the trial court did not err in determining the invoices and Hill's testimony was competent and credible evidence of Hill's breach of contract damages.

{¶105} Appellant's second assignment of error is overruled.

III.

{¶106} In its third assignment of error, Thompson Thrift argues the trial court erred in finding it tortuously interfered with Hill's business relations and in awarding damages for tortious interference.

{¶107} The elements of tortious interference with a business relationship are: (1) the existence of a business relationship; (2) the wrongdoer's knowledge of the relationship; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom. *General Medicine P.C. v. Morning View Care Center,* 5th Dist. Tuscarawas No. 2003AP12-0088, 2004-Ohio-4669. An entity is subject to liability for the tort of intentional interference with a prospective business relationship if the interference consists of: (a) inducing or otherwise causing a third person

not to enter into or continue the prospective relation, or (b) preventing the other from acquiring or continuing the prospective relation. Restatement of the Law (2nd), Torts, Section 766B (1979).

{¶108} Thompson Thrift first contends the trial court erred in finding in favor of Hill on his tortious interference with business claim because there was no evidence of breach or termination of Hill's relationship with his employees, who are independent contractors.

{¶109} We find there is competent and credible evidence to support the trial court's determination that a business relationship existed between Hill and his workers, Thompson Thrift was aware of this relationship, and intentionally interfered with this relationship. Hill testified commercial framing requires unique skills because it is a dangerous business. Further, that the Polaris project was particularly difficult because of inverted hangers and specialty items. Hill stated he had a core group of carpenters he recruited over time. Hill testified it takes years to formulate this core group and teach them your way of framing. Roshon testified the carpenters working at Mega were experienced on large projects as it was the same group of ten to fifteen guys working on these large projects.

{¶110} Roshon testified that when Hill told them to stop working on the Polaris project, Thompson Thrift had a meeting with the guys to go back to work on the project. The meeting was held at Thompson Thrift's trailer at the Polaris site. Roshon stated he and approximately ten other guys who worked for Mega were at the meeting, along with the Thompson Thrift guys. Roshon testified that during this meeting, Thompson Thrift told the Mega carpenters they wanted them to come work for them on the Polaris project.

They were not hired directly by Thompson Thrift but Thompson Thrift asked them to sign up with a temporary agency so they did not have to do the paperwork.

{¶111} Roshon stated when he worked for the temporary agency and Hahn, Thompson Thrift provided the tools he used, provided direction for the project, determined the makeup of the crews, and inspected the work. Roshon testified that fifteen to twenty former Mega carpenters were working on the Polaris project after Hill left and the same individuals working on the Polaris project in 2013 were the same ones that were working the Polaris project in 2014, except for Hill. Roshon was on the Polaris project until the framing was substantially complete.

{¶112} Hill found out his men were still working on the Polaris project on approximately January 2 or 3. When Hill received a letter from Thompson Thrift telling him he was no longer on the project, he contacted his men and found out Thompson Thrift approached his employees to continue on the project without him. Hill stated fifteen to twenty of his men continued to work on the Polaris project and these were people Hill recruited and put together as a team. Hill testified since he lost his core group of carpenters, he could not line up another project. Hill stated he could not hire someone else to work on other projects because these workers are specialized, they know the regulations, are highly-skilled individuals, and it would be dangerous to hire unskilled workers to work on complicated commercial jobs. Hill does not know the name of the temporary agency his employees were working through, but knew they were working at 801 Polaris Parkway.

{¶113} Divine's testimony also confirmed the difficulty of hiring framers to do commercial work as he testified Thompson Thrift kept Lynn and Hill on the job despite

Thompson Thrift having problems with their job performance because it is "difficult to find framers to work on a project with this complexity."  Further, though Divine was not aware that Hill's former employees were employed by a temporary agency, he testified Thompson Thrift hiring framers through a temporary agency would be atypical, as Thompson Thrift does not generally use temporary agencies for large scopes of work, but only for site cleanup and small tasks.

{¶114} Thompson Thrift next contends the trial court erred in finding in favor of Hill on his claim of tortious interference because its interference was privileged as fair competition.  The Ohio Supreme Court has held the establishment of the privilege of fair competition will defeat a claim of tortious interference when an employment contract is at-will and where all the elements of Section 768 of the Restatement are met such that a competitor may take action to attract business, even if that action results in an interference with another's business.  *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 1999-Ohio-260, 707 N.E.2d 853.  The privilege will defeat a claim of tortious interference if: (a) the relation concerns a matter involved in the competition between the actor and the other; (b) the actor does not employ wrongful means; (c) his action does not create or continue an unlawful restraint of trade; and (d) his purpose is at least in part to advance his interest in competing with the other.  Restatement of the Law (2nd), Torts, Section 768 (1979).

{¶115} To determine whether the conduct is improper or privileged, Ohio courts look to the nature of the actor's conduct, motive, interests interfered with, interests of the actor, societal interest, remoteness of the interference, and the relationship of the parties.

*Dryden v. Cincinnati Bell Telephone*, 135 Ohio App.3d 394, 734 N.E.2d 409 (1st Dist. 1999); *Polen v. Heaston*, 5th Dist. Tuscarawas No. 2016AP020011, 2016-Ohio-7508.

{¶116} In our review of the record, we find the trial court did not abuse its discretion in finding the interference by Thompson Thrift was not privileged in this case. Here, the relationship between the parties is general contractor to subcontractor on the same project, Thompson Thrift recognized the difficulty of hiring framers for the project and kept Lynn/Hill on the project despite their alleged failures due to this difficulty, Thompson Thrift held the meeting with the employees of Hill days after they removed Hill from the project, it interfered with Hill's ability to work on another commercial framing project, and the interference occurred on the job site where Hill worked days prior. Further, there was no evidence or argument at the hearing that employment of skilled workers for framing concerns a matter involved in the competition between Thompson Thrift, a general contractor, and Hill, a framing subcontractor, or that Thompson Thrift's purpose in recruiting the skilled framing workers was, in part, to advance their interest in competing with Hill.

{¶117} Thompson Thrift also contends the trial court erred in awarding Hill damages on his tortious interference claim because there is a lack of proof of damages from the tortious interference. Damages are the fourth element of the tort of intentional interference with a business relationship. "A plaintiff is entitled to restitution for any pecuniary loss which naturally and proximately results from such intentional misconduct." *Morrison v. Renner*, 5th Dist. Muskingum No. CT2011-0010, 2011-Ohio-6780.

{¶118} An appellate court reviews a lower court's decision in regards to damage calculations under the competent, credible evidence standard. *C.E. Morris Co. v. Foley*

*Construction*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).  A reviewing court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the judgment rendered by the trial court.  *Id.*

{¶119} We find there is competent and credible evidence to support the amount of damages the trial court awarded to Hill on his tortious interference claim.  Hill testified if he had been able to finish the contract on the Polaris project, he would have earned another $73,686.  Further, that he could have finished the Polaris project, but he was prevented from doing so when Thompson Thrift hired his core group of men.  Hill stated Thompson Thrift's hiring of his employees caused Hill to lose potential $73,686 in profit, as the project was tracking at a 17% profit, based upon the amount he was getting paid, minus expenses.  Due to the testimony that not all of Hill's former workers worked until the end of the project, the arbitrators and trial court only awarded Hill half of the lost profit he was seeking.

{¶120} Thompson Thrift argues Divine's testimony about the problems with Hill's performance on the job means that Hill did not complete the project not because he lost his independent contractors, but because Thompson Thrift did not let him do so due to his poor performance.  However, Divine testified he was not on site when Hill performed the work, as he was on a different project in Arkansas from May of 2013 to April of 2014.  Additionally, as noted above, it is up to the trial court to determine the credibility of the witnesses and weigh the evidence.

{¶121} Appellant's third assignment of error is overruled.

IV.

{¶122} In its fourth assignment of error, Thompson Thrift contends even if the trial court did not err in finding them liable for tortious interference, the trial court erred in awarding Hill attorney fees on his tortious interference claim.  Thompson Thrift concedes it did not file an objection to the arbitrator's decision on this issue.  Accordingly, since Thompson Thrift did not file this objection under Civil Rule 53(D)(3)(b), it has therefore waived the right to appeal this issue pursuant to Civil Rule 53(D)(3)(b)(iv), except for plain error.  *Walters v. Walters*, 5th Dist. Fairfield No. 15-CA-1, 2015-Ohio-2916.

{¶123} However, in appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where the error seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself.  *Kell v. Russo*, 5th Dist. Stark No. 2011 CA 0082, 2012-Ohio-1286.  The doctrine should be applied in extremely unusual circumstances where the error complained of, if left uncorrected, would have a material adverse effect on the character and public confidence on the character and public confidence in the judicial proceeding.  *Id.*

{¶124} We find no plain error in this case.  On May 26, 2016, Thompson Thrift and Hill filed a "stipulation of attorney fees" which stated as follows:

Accordingly, be advised that subject to the Objections filed with the court,

and without waiving any of those objections, Hill and Thompson Thrift

hereby STIPULATE that in the event the Court adopts the Arbitrators'

Decision awarding Hill attorney fees on the disputed tortious interference

claim, the amount of fees on the tortious interference claim shall be $16,852.

{¶125} Here, the stipulation is subject to the objections filed with the court. Thompson Thrift's objections to the trial court with regards to attorney fees dealt only with the finding of tortious interference; its argument regarding attorney fees was simply that Hill should not be awarded attorney fees if Thompson Thrift was not found to be culpable for the tort. Thompson Thrift made no argument in its objections to the trial court that the attorney fee award was improper even if Thompson Thrift was liable for tortious interference.

{¶126} Further, though Thompson Thrift argues the trial court did not specifically make a finding of "bad faith" for attorney fees, it is clear the arbitrators considered the conduct of Thompson Thrift's interference with regards to attorney fees as the arbitrators found Hill was entitled to an award of attorney fees "because of the intentional nature of the tortious interference by Thompson Thrift." Thompson Thrift never objected to this determination, so the trial court did not address the issue. Because the stipulation was filed regarding attorney fees and was subject only to its previously-filed objections, the fact that the trial court did not make an express finding of bad faith was not plain error.

{¶127} Appellant's fourth assignment of error is overruled.

{¶128} Based on the foregoing, we overrule Thompson Thrift's second, third, and fourth assignments of error. We sustain in part and overrule in part Thompson Thrift and Fidelity's first assignment of error. The September 12, 2016 judgment entry of the Delaware County Court of Common Pleas is affirmed in part and reversed and remanded in part to the trial court for further proceedings consistent with this opinion.

By Gwin, J.,

Delaney, P.J., and

Hoffman, J., concurs

separately

*Hoffman, J., concurring*

{¶129}   I concur in the majority's thorough and well-reasoned analysis of Appellant's assignments of error.

{¶130}   I write separately only to note my disagreement with our standard of review. The majority applies an abuse of discretion standard of review when we review a decision of a trial court overruling or sustaining objection(s) to a magistrate's decision.[1]   I believe the standard of review depends upon the nature of the objection made to the trial court. While there may well be times we will apply an abuse of discretion standard, there are other times we may apply a manifest weight of the evidence, sufficiency of the evidence, or even a de novo standard if pure issues of law are involved.   This Court should apply the same standard of review we would apply had the trial court heard the matter in the first instance without the use of a magistrate.   The fact the trial court independently reviews objection(s) to a magistrate's decision does not necessarily transform our standard of review to the heightened abuse of discretion standard in all instances. (For a more thorough rationale see my dissenting opinion in *Orthopaedic Care, Inc. v. Trans Global Adjusting Corp.* (Nov. 19, 2001), Stark App. No. 2001CA00215.)

---

[1] In support the majority cites *Kolano v. Kolano*, 5th Dist. Tuscarawas No. 2014AP060026, 2015-Ohio-1369.  I candidly concede I authored that opinion.