[Cite as *Phoenix Lighting Group, LLC v. Genlyte Thomas Group, LLC*, 2018-Ohio-2393.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

PHOENIX LIGHTING GROUP LLC, et al.

    Appellee/Cross-Appellant

v.

GENLYTE THOMAS GROUP LLC, et al.

    Appellant/Cross-Appellee

C.A. No.     28082

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CV-2012-08-4444

DECISION AND JOURNAL ENTRY

Dated: June 20, 2018

SCHAFER, Presiding Judge.

**{¶1}** Defendant-Appellant/Cross-Appellee, Genlyte Thomas Group, L.L.C. ("DCO"), appeals the judgment of Summit County Court of Common Pleas in favor of Appellee/Cross-Appellant, Phoenix Lighting Group, L.L.C. ("Phoenix"). Phoenix also appeals the judgment. This Court affirms in part, reverses in part, and remands for further proceedings consistent with this opinion.

I.

**{¶2}** Patrick Duffy is the sole owner of Jack Duffy and Associates, Inc. ("JDA") a light sales agency for Acuity Brands Lighting, Inc. ("Acuity") operating in the Akron, Ohio market. Duffy created Phoenix in order to facilitate the purchase of Lighting Sales, Inc., an Acuity lighting sales agency then owned by Stu Eisenberg and operating in the Cleveland, Ohio market. Phoenix ultimately purchased LSI on January 1, 2014, paying Eisenberg $50,000.00 prior to closing, $100,000.00 at closing, and an additional $40,000.00 a year for the following five years,

for a total purchase amount of $350,000.00. Thereafter, Phoenix did business as LSI in the Cleveland market, continuing to represent Acuity and a number of other vendors with products that complimented the Acuity products. Although Duffy owned both Phoenix and JDA, the two companies were operated separately. Specifically, the two companies had separate tax identification numbers, filed taxes separately, had separate financial records, had separate employees, and with a few exceptions, operated in distinct geographical markets. Additionally, Phoenix operated as an LLC and JDA as an S corporation. In order to smooth the transition in ownership and continue the success of LSI, Phoenix retained Eisenberg as its vice president pursuant to a five-year employment agreement and a covenant not to compete. Including Eisenberg, Phoenix had ten employees, including Guy Day, Jason Brown, Sean Cunningham, Tom Sonneborn, Kerry Freeborn, Linda Rath, Jason Breckner, Kathy Levine, and Rick Racey.

{¶3} During the time that Duffy owned Phoenix, the company's sales and profitability increased. Then, in early 2008, Brown and Day approached Duffy about purchasing Phoenix and the parties entered into negotiations. Recognizing that it would be necessary for Phoenix to disclose certain confidential information during the course of the negotiations, Brown, Day, and Duffy signed a mutual confidentiality agreement. Brown and Day eventually sent an offer to Duffy in August 2008 proposing a purchase price significantly below Duffy's expectations. Nonetheless, negotiations continued through the end of 2008.

{¶4} Meanwhile, Brown and Day also considered starting their own lighting sales agency representing products manufactured by DCO, a competitor of Acuity. Accordingly, Day contacted Mark Hughes, a regional sales manager at DCO, in late summer 2008 to inquire about creating an agency relationship. During this conversation, Day disclosed to Hughes that he and Brown were negotiating with Duffy to purchase Phoenix. Nevertheless, DCO had become

dissatisfied with the performance of the current agency representing it in the Cleveland market and Hughes asked to meet with Brown and Day. Hughes, Brown, and Day met in Cleveland about two weeks later. Hughes then asked Brown and Day to create a business plan for the potential new agency.

{¶5} In creating their business plan for the new agency, Brown and Day utilized information they gained while working for Phoenix and through their negotiations with Duffy for the purchase of Phoenix. The business plan identified several Phoenix employees as the future employees of the new agency. The business plan also contemplated financial support from DCO. Brown and Day shared the business plan with Hughes. Hughes subsequently shared the plan with other executives from DCO, including Robert Carswell, DCO's vice president of sales, and Jim O'Hargan, DCO's general manager (collectively "DCO executives").

{¶6} Subsequently, in late January 2009, Brown, Day, and Eisenberg traveled to DCO's headquarters in Tupelo, Mississippi, and then to Texas, without Duffy's knowledge, to meet with DCO executives. During those meetings Brown and Day expressed to the DCO executives that they were in negotiations with Duffy to potentially purchase Phoenix and that they would need financial assistance if they were to start a new agency representing DCO. Although Brown, Day, and Eisenberg kept their contact with DCO a secret from Duffy, Duffy eventually learned of the discussions. In response, Duffy fired Eisenberg pursuant to the non-compete agreement and asked Brown and Day to sign a non-compete agreement. Brown and Day declined and resigned in February 2009.

{¶7} Ultimately, Brown and Day decided to start their own lighting sales agency. Brown and Day formed Intelligent Illumination and signed a contract on behalf of Intelligent Illumination to represent DCO in an agency capacity. After contracting with DCO, Brown and

Day returned Phoenix's confidential information they had received from Duffy during their negotiations. In addition to Brown and Day, Intelligent Illumination hired a number of Phoenix's key employees and four additional employees. Although Phoenix's business was essentially destroyed after Brown and Day's resignations, Duffy announced a plan to consolidate Phoenix with JDA.

{¶8} On April 1, 2009, Phoenix filed a complaint against Brown, Day, and a then unknown business entity later identified as DCO, alleging various business related torts. The matter then proceeded through the pretrial process. However, on June 1, 2012, Phoenix dismissed the matter without prejudice. Phoenix subsequently refiled this matter against Brown, Day, and DCO on August 2, 2012. The original trial judge recused herself and the matter was reassigned. Phoenix filed an amended complaint in May 2013.

{¶9} The matter ultimately proceeded to a four week jury trial beginning May 12, 2014. After a number of witnesses testified, Phoenix entered into a confidential settlement agreement with Brown and Day and the trial court dismissed them from the case. On June 11, 2014, the jury returned a verdict in favor of Phoenix and against DCO on a number of the claims in the complaint. Specifically, the jury found that DCO had tortiously interfered with Phoenix's business relationships, misappropriated Phoenix's trade secrets, and participated in a civil conspiracy to tortiously interfere with Phoenix's business relationships, to breach a duty of loyalty owed to Phoenix, and to misappropriate Phoenix's trade secrets.

{¶10} The jury awarded compensatory damages in the aggregate amount of $1,680,970.00. Following a punitive damages hearing, the jury found that DCO's conduct was malicious and awarded Phoenix an additional $7,000,000.00 on Phoenix's claims of tortious interference with a business relationship and civil conspiracy. However, pursuant to R.C.

2315.21(D), the trial court reduced the punitive damages award to $2,761,940.00. Additionally, the trial court awarded treble damages on the claim of direct misappropriation of trade secrets pursuant to R.C. 1333.63(B), trebling the $300,000.00 jury awarded compensatory damages to $900,000.00. The jury also found that Phoenix was entitled to recover reasonable attorney fees. Following a hearing, the trial court awarded Phoenix $3,983,014.00 for attorney fees plus litigation expenses, costs, and prejudgment interest. The trial court awarded Phoenix a total of $9,511,435.07, plus court costs.

{¶11} DCO filed post-trial a motion for judgment notwithstanding the verdict, or in the alternative, motion for new trial or motion for remittitur. The trial court subsequently denied the motion.

{¶12} DCO filed a timely appeal, raising seven assignments of error for our review. For ease of the analysis, we elect to consider the assignments of error out of order. Since assignments of error II, III, and IV implicate similar issues, we elect to consider them together.

{¶13} Phoenix also filed a timely appeal, raising two assignments of error for our review.

## II.

### DCO's Assignment of Error II

**The trial court erred as a matter of law by not granting a directed verdict or judgment notwithstanding the verdict in favor of DCO on Plaintiff's claim for tortious interference with business relationships because Plaintiffs failed to present sufficient evidence in support of this claim.**

### DCO's Assignment of Error III

**The trial court erred as a matter of law by not granting a directed verdict or judgment notwithstanding the verdict in favor of DCO on Plaintiff's claim for misappropriation of trade secrets because Plaintiffs failed to present sufficient evidence in support of this claim.**

## DCO's Assignment of Error IV

**The trial court erred as a matter of law by not granting a directed verdict or judgment notwithstanding the verdict in favor of DCO on Plaintiff's claim for civil conspiracy because Plaintiffs failed to present sufficient evidence in support of this claim.**

{¶14} In its second, third, and fourth assignments of error, DCO contends that the trial court erred by not granting its motions for directed verdict or its motions for judgment notwithstanding the verdict on Phoenix's claims for tortious interference with business relationships, misappropriation of trade secrets, and civil conspiracy because Phoenix failed to present sufficient evidence to support its claims. We disagree.

{¶15} As a motion for directed verdict presents a question of law, our review is de novo. *Roberts v. Falls Family Practice, Inc.*, 9th Dist. Summit No. 27973, 2016-Ohio-7589, ¶ 11, citing *Spero v. Avny*, 9th Dist. Summit No. 27272, 2015-Ohio-4671, ¶ 17. "A trial court must grant a motion for directed verdict after the evidence has been presented if, 'after construing the evidence most strongly in favor of the party against whom the motion is directed, * * * reasonable minds could come to but one conclusion upon the evidence submitted[.]'" *Roberts* at ¶ 11, citing Civ.R. 50(A)(4) and *Parrish v. Jones*, 138 Ohio St.3d 23, 2013-Ohio-5224, ¶ 16. Nonetheless, "if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied." *Hawkins v. Ivy*, 50 Ohio St.2d 114, 115 (1977). "A motion for a directed verdict assesses the sufficiency of the evidence, not the weight of the evidence or the credibility of the witnesses." *Jarvis v. Stone*, 9th Dist. Summit No. 23904, 2008-Ohio-3313, ¶ 7, citing *Strother v. Hutchinson*, 67 Ohio St.2d 282, 284 (1981).

**{¶16}** After a trial court enters a judgment on a jury's verdict, a party may file a motion for judgment notwithstanding the verdict to have the judgment set aside on grounds other than the weight of the evidence. Civ.R. 50(B). Judgment notwithstanding the verdict "is proper if upon viewing the evidence in a light most favorable to the non-moving party and presuming any doubt to favor the non-moving party reasonable minds could come to but one conclusion, that being in favor of the moving party." *Williams v. Spitzer Auto World, Inc.*, 9th Dist. Lorain No. 07CA009098, 2008-Ohio-1467, ¶ 9. However, if "there is substantial evidence to support [the non-moving party's] side of the case, upon which reasonable minds may reach different conclusions the motion must be denied." *Jackovic v. Webb*, 9th Dist. Summit No. 26555, 2013-Ohio-2520, ¶ 15, quoting *Osler v. City of Lorain*, 28 Ohio St.3d 345, 347 (1986). "As with an appeal from a court's ruling on a directed verdict, this Court reviews a trial court's grant or denial of a judgment notwithstanding the verdict de novo." *Jackovic* at ¶ 15, quoting *Williams* at ¶ 9.

**A. Tortious Interference with a Business Relationship**

**{¶17}** Phoenix alleged in its complaint that DCO individually and in cooperation with Brown and Day tortiously interfered with Phoenix's business relationships with its former employees. After the trial, the jury found that DCO had tortiously interfered with Phoenix's business relationship with one or more of the former employees, but did not specify with which relationship or relationships DCO interfered. "The elements of 'tortious interference with a business relationship are: (1) a contractual or business relationship; (2) knowledge of the relationship by the tortfeasor; (3) an intentional and improper act by the tortfeasor preventing formation of a contract, procuring breach of a contract, or termination of a business relationship; (4) lack of privilege on the part of the tortfeasor; and (5) resulting damage.'" *Bindra v.*

*Fuenning*, 9th Dist. Summit No. 26489, 2013-Ohio-5722, ¶ 14, quoting *Tripp v. Beverly Ent.-Ohio, Inc.*, 9th Dist. Summit No. 21506, 2003-Ohio-6821, ¶ 48. "Tortious interference with a business relationship does not require the breach of contract, rather it is sufficient to prove that a third party does not enter into or continue a business relationship with the plaintiff." *Gentile v. Turkoly*, 7th Dist. Mahoning No. 16 MA 0071, 2017-Ohio-1018, ¶ 24, citing *Magnum Steel & Trading L.L.C. v. Mink*, 9th Dist. Summit Nos. 26127, 26231, 2013-Ohio-2431, ¶ 10. "A tortfeasor in such a case must act maliciously before courts will permit recovery." *Tripp* at ¶ 48, citing *Haller v. Borror Corp.*, 50 Ohio St.3d 10, 16 (1990).

{¶18} The Supreme Court of Ohio has stated the following,

> In determining whether an actor has acted improperly in intentionally interfering with a contract or prospective contract of another, consideration should be given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Fred Siegel Co., LPA v. Arter & Hadden*, 85 Ohio St.3d 171, 1999-Ohio-260, paragraph three of the syllabus (adopting Restatement of the Law 2d, Torts, Section 767 (1979)). Although the listed factors are important, the weight carried by the factors may vary considerably. Restatement of the Law 2 Torts, Section 767, Comment a. "In particular, the 'nature of the actor's conduct' and 'the relation between the parties' are both important factors in determining whether the interference was improper." *Paramount Farms Intl., L.L.C. v. Ventilex B.V.*, 12th Dist. Butler No. CA2015-02-029, 2016-Ohio-1150, ¶ 37, citing Restatement of the Law 2d, Torts, Section 767, Comments c and i. "The issue is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing it in the manner in which he does cause it." *Id.* at ¶ 38, citing Restatement, Section 767, Comment c.

{¶19} It is undisputed that the former Phoenix employees, including Brown and Day, had a business relationship with Phoenix, that DCO knew those employees had a business relationship with Phoenix, and that those employees terminated that business relationship. Accordingly, DCO limits its argument on appeal to the contention that Phoenix failed to present evidence that DCO improperly or maliciously interfered with Phoenix's business relationships and that Phoenix failed to present evidence that DCO's conduct was not privileged. DCO specifically argues that (1) "exploring potential employment or business opportunities with at-will employees who are not subject to noncompetition agreements does not constitute tortious interference as a matter of law," (2) DCO could not have interfered as a matter of law because Brown and Day severed their relationship with Phoenix before entering into a business relationship with DCO; (3) DCO did not have any direct communication with the former Phoenix employees prior to their resignations from Phoenix; and (4) DCO's conduct was privileged as fair competition.

{¶20} Upon review of the record in this matter, we determine that Phoenix presented sufficient evidence from which reasonable minds could reach differing conclusions as to whether DCO acted improperly and without privilege when it interfered with Phoenix's business relationships with its employees.

{¶21} The Supreme Court of Ohio has held that the "establishment of the privilege of fair competition, as set forth in Section 768 of the Restatement, will defeat a claim of tortious interference with contract where the contract is terminable at will." *Siegel* at 179-180. "Pursuant to Section 768, competition is proper if (a) the relation between the actor (here [DCO]) and his or her competitor (here [Phoenix]) concerns a matter involved in the competition between the actor and the other, and (b) the actor does not employ wrongful means, and (c) his

action does not create or continue an unlawful restraint of trade, and (d) his purpose is at least in part to advance his interest in competing with the other." *Id.* at 180. Thus, the Supreme Court of Ohio has specifically recognized that "where an existing contract is terminable at will, *and* where all the elements of Section 768 of the Restatement are met, a competitor may take action to attract business, even if that action results in an interference with another's existing contract." (Emphasis added.) *Id.* at 179.

{¶22} It is undisputed in the case that the former Phoenix employees were at-will employees. Thus, Phoenix had the burden to demonstrate that DCO's conduct was improper. *See Long v. Mount Carmel Health System*, 10th Dist. Franklin No. 16AP-511, 2017-Ohio-5522, ¶ 27. "To determine whether the conduct is improper or privileged, Ohio courts look to the nature of the actor's conduct, motive, interests interfered with, interests of the actor, societal interest, remoteness of the interference, and the relationship of the parties." *Thompson Thrift Construction v. Lynn*, 5th Dist. Delaware No. 16 CAE 10 0044, 2017-Ohio-1530, ¶ 115, citing *Dryden v. Cincinnati Bell Telephone*, 135 Ohio App.3d 394, 400 (1st Dist.1999).

{¶23} Day testified that he and Hughes discussed the problems DCO had with the previous agency representing DCO in the Cleveland market. Hughes testified that the reason he believed the previous agency was underperforming was because "they were understaffed on the outside sales team and they had damaged relationships in the market." Carswell also stated that the previous agency did not have enough properly trained sales people. As a result, DCO was looking to replace them due to "their lack of sales" and "their lack of responsiveness in hiring a better outside team." Although DCO did not have any direct contact with any of the former Phoenix employees other than Brown and Day, it is undisputed that Brown and Day submitted a business plan to DCO in October 2008 at Hughes' request. That business plan states that "[t]he

future employees of [the new agency] are currently employed by the top lighting manufacturer's agency in Northeast Ohio, Lighting Sales, Inc./Jack Duffy and Associates (LSI/JDA)" and that Brown and Day's "current fellow employees are prepared to take the next step with Day-Brown and [DCO] and are very excited about it." The business plan then specifically lists seven additional employees by name, six of which were then employed by Phoenix. Eisenberg was included among those employees. The business plan also stresses that while the right combination of lighting manufacturers is "critical," the new agency's "people are much more so." The business plan further states,

> [w]ith our successful team at Lighting Sales, Inc fully converted over the products and systems of DCO along with our top tier manufacturers, who have verbally committed to this venture, we are prepared to bring sales and profitability unseen to DCO in the Northeast Ohio market. In one fell swoop we will start a new business while knocking out the current top player.

Day testified that Phoenix was indeed the "current top player" in the Cleveland lighting sales market. Day testified that the representations and statements in the business plan were true to the best of his knowledge.

{¶24} Prior to the Mississippi/Texas trip, Hughes emailed Day, stating that "[a]ll parties have your business plan and are reviewing." Day understood "all parties" to mean at least Carswell and O'Hargan were reviewing the business plan. Indeed, both Hughes and Carswell testified they had reviewed the business plan submitted by Day and Brown. Although O'Hargan testified he did not read through the business plan, he stated that he was sure he was given the business plan and that he was sure Hughes spoke with him about it. Additionally, Day testified that during the Tupelo, Mississippi trip, he spoke with the DCO executives about the Phoenix employees he and Brown intended to take with them to the new agency. Day also stated that no one from DCO ever expressed any concern about the propriety or legality of the business plan.

{¶25} Hughes acknowledged that although he believed it to be "fluff," he did speak with Carswell and O'Hargan about the business plan's "concept of taking all of the employees of [Phoenix] and making them employees of Intelligent Illumination." Hughes described his conversation with Carswell and O'Hargan as "they asked some questions, one of which was, Mark, do you believe they'll get all of these employees? The answer is, No, I do not. They asked why. I'm, like, guys, statistically it's almost impossible for that to happen." Although O'Hargan did not recall Hughes or Carswell discussing Brown and Day's plan regarding the Phoenix employees, he also stated that he believed it would be "impossible" to "pull off something like that." Nonetheless, O'Hargan did acknowledge that "[f]rom a business ethic standpoint" he would "have a problem with [the plan]," but as the new agency would be an independent business, he "wouldn't have made any comment or given any advice, one way or another."

{¶26} During the Mississippi/Texas trip, the DCO executives also learned Eisenberg was subject to a covenant not to compete with Phoenix, yet allowed him to participate as an advisor to Day and Brown in the meetings that followed. The evidence also shows that the DCO executives remained interested in Eisenberg's "status" for months after he was fired from Phoenix.

{¶27} Jason Breckner, a former employee of Phoenix testified that Brown, Day, and Eisenberg had created an atmosphere and belief at Phoenix that Duffy did not know how to lead an agency. Kathy Levine, another former employee of Phoenix, buttressed Breckner's testimony, stating that although she did not have any firsthand experience with Duffy she had gotten the impression he was not a good businessperson from statements made by Day, Brown, and Cunningham. Breckner and Levine also testified that they and other employees were told by Day and Brown in the Spring of 2008 that they were in negotiations to purchase Phoenix.

However, in late summer of that year, Day and Brown told a number of employees during a closed door meeting that they were going to approach another manufacturer to sponsor them to start a new agency. Breckner stated that during that meeting, Brown and Day solicited or invited the Phoenix employees to be a part of the new agency. Levine testified that she was personally asked to join the new agency in late 2008. Breckner stated the employees "were all on board" whether Day and Brown purchased Phoenix or started a new agency representing DCO. Additionally, Breckner and Levine testified that after Brown, Day, and Eisenberg returned from the Mississippi/Texas trip the focus at Phoenix was going to a new agency. Levine further testified that "nobody" was paying attention to the business of Phoenix in January and February of 2009.

{¶28} Taken in a light most favorable to Phoenix, the above testimony suggests that DCO knew of and encouraged Brown and Day, while in the employ of Phoenix, to not only develop a business plan with the intention of usurping nearly all of Phoenix's workforce, but to also solicit those employees while employed in key positions at Phoenix. *See Gracetech Inc. v. Perez*, 8th Dist. Cuyahoga No. 96913, 2012-Ohio-700, ¶ 22 (concluding that reliance on the fair competition privilege is misplaced where an employee set up a competing business and solicited a client while having management-type responsibilities to keep business operating after death of owner.) The testimony also suggests that although DCO knew Eisenberg was subject to a covenant not to compete with Phoenix, DCO continued to encourage his role as an advisor to Brown and Day both during and after the time all three were employed at Phoenix. *See Gracetech* at ¶ 24 (implying that solicitation of employees known to have signed an agreement to not compete can form the basis of a claim for tortious interference). The testimony further suggests that DCO knew Brown and Day had access to confidential business records since they

14

were in negotiations to purchase Phoenix and subject to a mutual confidentiality agreement. As such, we conclude that there was sufficient evidence presented at trial from which reasonable minds could reach a different conclusion as to whether DCO acted improperly.

{¶29} Therefore, the trial court did not err in denying DCO's motion for directed verdict or motion for judgment notwithstanding the verdict as they related to Phoenix's claim for tortious interference with a business relationship. Accordingly, DCO's second assignment of error is overruled.

## B. Misappropriation of Trade Secrets

{¶30} Phoenix also alleged in its complaint, and the jury found by a preponderance of the evidence, that DCO misappropriated Phoenix's trade secrets. Although Phoenix alleged at trial that DCO had misappropriated its personnel, sales, and business strategy trade secrets, the jury's verdict does not specify if it found DCO had misappropriated all of the alleged trade secrets, one of the alleged trade secrets, or a combination of the alleged trade secrets.

{¶31} R.C. 1333.61 defines a trade secret as

information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

"The question whether a particular knowledge or process is a trade secret is a question of fact to be determined by the trier of fact upon the greater weight of the evidence." *Siegel*, 85 Ohio St.3d 171 at paragraph six of the syllabus. "[A] complainant in a civil action is entitled to recover

damages for misappropriation [of trade secrets]." R.C. 1333.63(A). Misappropriation is the "[a]cquistion of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." R.C. 1333.61(B)(1). The Supreme Court of Ohio has recognized that "listings of names, addresses, or telephone numbers that have not been published or disseminated, or otherwise become a matter of general public knowledge, constitute trade secrets if the owner of the list has taken reasonable precautions to protect the secrecy of the listing to prevent it from being made available to persons other than those selected by the owner to have access to it in furtherance of the owner's purposes." *Siegel Co.*, 85 Ohio St.3d at paragraph 5 of the syllabus.

**{¶32}** On appeal, DCO contends that Phoenix failed to present sufficient evidence to establish that the information at issue constitutes trade secrets. Specifically, DCO argues that (1) the sales projections created by Day and submitted to DCO as part of the business plan were not Phoenix's sales figures nor were the projections derived from Phoenix's sales figures; (2) Phoenix's employee information was publicly available and known through the industry; and (3) Phoenix failed to identify what trade secret business strategies were allegedly misappropriated by DCO, what their economic value was, nor what efforts were undertaken to maintain them as confidential.

**{¶33}** Nonetheless, upon review of the record, we determine that Phoenix presented sufficient evidence at trial so as to create a factual question for the jury on the issue of whether DCO misappropriated Phoenix's trade secrets. The evidence in this case shows that DCO knew Brown and Day were in negotiations with Duffy to potentially purchase Phoenix and were subject to a mutual non-disclosure agreement. The evidence also shows that the business plan submitted to Hughes and DCO listed specific personnel information of current Phoenix

employees. Day acknowledged that business strategies within the business plan "could have been" or were strategies he had discussed with Duffy with respect to Phoenix. Day also acknowledged upon cross-examination that DCO was a competitor of Acuity and that if Phoenix's financial information was provided to DCO, it would allow DCO to know what Phoenix's sales force was capable of selling as an agency.

{¶34} Breckner, an employee of Phoenix from 2006 until it closed in 2009, testified that he did "quotations" work for Phoenix. Breckner confirmed that employees of Phoenix were given an employee policy manual or handbook that contained provisions relating to confidentiality. Breckner stated that he understood Phoenix's policy to maintain the confidentiality of personnel information including employee's résumés, names, phone numbers, and personal information. He also stated that he understood that sales data was confidential information and that access to that information was "kind of on a need-to-know basis." For example, Breckner testified that in his position he did not have access to "sales data for a quarter for a particular manufacturer or any kind of measurable profit-and-loss kind of statement or kind of sales data from a manufacturer," but that salespeople were sometimes privy to such information. Breckner also testified that financial information such as commission rates, financial statements, and margin rates were "extremely sensitive material" and "confidential" and that such information needed "to be kept pretty much under lock and key in the agency." Breckner further testified that business strategies including marketing strategy and employee structure were kept confidential because the company spent a lot of time developing strategy and "you definitely don't want your competitor knowing what your strategy is, how you go to the market, what you're looking for." Breckner believed that it was common knowledge at Phoenix that the above confidential information was owned by the company and not for personal use. He

also testified regarding the security measures Phoenix put in place to protect this information, such as the employee policy manual with confidentiality provisions, computer passwords, Wi-Fi firewalls, locked doors with security code access, security system, and visitors always being accompanied.

{¶35} Levine's testimony and Duffy's testimony buttressed Breckner's testimony with regard to confidential information at Phoenix. Levine stated that she considered "anything under the roof" of Phoenix to be confidential. Specifically, she identified financial information such as quotes, orders, and pricing. Similarly, Duffy agreed that information regarding sales figures, personnel information, and business and marketing strategies were kept confidential at Phoenix since its business is not known in the community. He stated that personnel information remained confidential so that competitors would not know what the strategic value was of the staff Phoenix employed. He stated that sales information had significant economic value because it "confirms the outcome of what we're able to generate, and that is unique to [Phoenix] based on who we are and how we go about it." Duffy further stated that certain information, such as the billing statistics sent to him by Acuity, were only shared with Eisenberg, who was subject to a confidentiality agreement. Duffy also described the methods by which the information was kept confidential, such as the employee policy manual with confidentiality provisions, computer passwords, Wi-Fi firewall, and locked doors.

{¶36} O'Hargan testified that he understood Brown and Day were negotiating a potential purchase of Phoenix and acknowledged that under a "due diligence process," obtaining financial information from the seller is standard in the acquisition of a business. Brown and Day both testified that after reviewing their initial business plan, Hughes recommended modifications to make the plan more "effective." As a result, Day expanded the financial section of the

business plan. Upon resubmitting the business plan, Day sent an email to Hughes wherein he stated he asked Hughes to take into consideration that he and Brown were unable to provide DCO with "specific financial information (sales dollars or commission dollars paid) * * * due to the non-disclosure/confidentiality agreement [Brown and Day] signed for [the] ongoing negotiations with the current owner." Day did, however, disclose to Hughes a range of the average commissions earned through all Acuity product segments. The evidence also shows that Hughes was aware that Duffy did not know Brown and Day were pursuing a business relationship with DCO.

{¶37} Based upon the above evidence, we conclude that there was sufficient evidence to create a question of fact for the jury as to whether DCO acquired Phoenix's trade secrets when it knew or had reason to know those trade secrets were acquired by improper means. Accordingly, the trial court did not err when it denied DCO's motion for directed verdict or when it denied DCO's motion for judgment notwithstanding the verdict as they related to Phoenix's claims for misappropriation of trade secrets. Therefore, DCO's third assignment of error is overruled.

**C. Civil Conspiracy**

{¶38} In its fourth assignment of error, DCO contends that the trial court erred when it did not grant DCO's motions for directed verdict and motion for judgment notwithstanding the verdict as they related to Phoenix's claim of civil conspiracy because Phoenix failed to demonstrate that DCO maliciously conspired with Brown and Day. DCO also argues in its fourth assignment of error that the trial court erred when it awarded damages for both the underlying torts and separate additional damages for conspiracy to commit those torts.

{¶39} Phoenix alleged in its complaint and the jury found by a preponderance of the evidence that DCO engaged in a civil conspiracy with Day and/or Brown to tortiously interfere

with business relationships, tortiously interfere with contractual relationship, misappropriate trade secrets, and breach the duty of loyalty, good faith, and trust.

**{¶40}** The tort of civil conspiracy is defined as "'a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.'" *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419 (1995), quoting *LeFort v. Century 21-Maitland Realty Co.*, 32 Ohio St.3d 121, 126 (1987). "An underlying unlawful act is required before a civil conspiracy claim can succeed." *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475 (1998), citing *Godsen v. Louis*, 116 Ohio App.3d 195, 219 (9th Dist.1996). "The malice involved in the tort is 'that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another.'" *Williams* at 475, quoting *Pickle v. Swinehart*, 170 Ohio St. 441, 443 (1960). "The element of 'malicious combination to injure' does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act." *Gosden* at 219. Additionally, "'[i]n a conspiracy, the acts of coconspirators are attributable to each other.'" *Gibson v. City Yellow Cab Co.*, 9th Dist. Summit No. 20167, 2001 WL 123467 (Feb. 14, 2001), quoting *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475 (1998).

**{¶41}** "Some Ohio cases have held that a plaintiff must allege and prove damages attributable to the conspiracy that are above and beyond those resulting from any underlying or supporting torts." *Gosden* at 220, citing *Crosby v. Beam*, 83 Ohio App.3d 501, 515-516 (6th Dist.1992), and *Stiles v. Chrysler Motors Corp.*, 89 Ohio App.3d 256, 266 (6th Dist.1993), both citing *Minark v. Nagy*, 8 Ohio App.2d 194, 195-196 (8th Dist.1963). However, this Court has previously held that those holdings "were based on a misreading" of previous cases and that "[t]he 'gist' of a conspiracy action is not the conspiracy itself, and the conspiracy only becomes

important after the wrong is committed. A civil conspiracy claim, therefore, serves only to enlarge the pool of potential defendants from whom a plaintiff may recover damages and, possibly, an increase in the amount of those damages[.]" *Gosden* at 220-221.

**{¶42}** Therefore, based upon the evidence outlined above, we conclude that there was sufficient evidence to create a question of fact for the jury as to whether DCO conspired with Brown and Day to tortiously interfere with Phoenix's business relationships and misappropriate Phoenix's trade secrets, and breach the duty of loyalty, good faith, and trust.

1. Damages for Civil Conspiracy

**{¶43}** In this case, the jury found that DCO had tortiously interfered with Phoenix's business relationships, misappropriated Phoenix's trade secrets, and participated in a civil conspiracy to tortiously interfere with Phoenix's business relationships, to breach a duty of loyalty owed to Phoenix, and to misappropriate Phoenix's trade secrets. Consequently, the jury awarded Phoenix $101,500.00 on its claim for tortious interference with business relationships and $300,000.00 on its claim for misappropriation of trade secrets. After finding DCO liable for civilly conspiring to commit those torts and additionally for conspiring with Brown and Day to breach their duty of loyalty to Phoenix, the jury awarded Phoenix an additional $476,470.00 on its claim against DCO for conspiring to tortiously interfere, $203,000.00 on its claim against DCO for conspiring to misappropriate trade secrets, and $600,000.00 on its claim against DCO for conspiring with Brown and Day to breach their duty of loyalty.

**{¶44}** DCO argued, inter alia, in its motion for new trial or remittitur that the jury instructions improperly permitted the jury to award duplicate damages. The trial court denied DCO's motion. "This Court's standard of review of an order denying a motion for a new trial depends upon the grounds of the motion." *Jackovic v. Webb*, 9th Dist. Summit No. 26555, 2013-

Ohio-2520, ¶ 17. As the basis of DCO's motion involves a question of law, we review de novo. *See id*.

**{¶45}** On appeal, DCO argues that "the trial court erred by awarding damages for the injury caused by the underlying torts and separate additional damages from conspiracy to commit those same torts." DCO bases its argument on this court's statement in *Gosden* that the element of "resulting in actual damages" essentially "restricts the measure of recovery for a conspiracy claim to those damages caused by the underlying tort (or torts) necessary to support the claim for civil conspiracy in the first place." *Gosden* at 220. On the contrary, Phoenix argues that the jury did not award it additional or duplicative damages, rather, the jury merely allocated the total damages to which Phoenix was entitled between different theories of recovery.[1]

**{¶46}** Initially, we note that DCO's reliance on this Court's statement in *Gosden* is misplaced as it is taken out of context. In *Gosden*, this Court was called upon to determine whether the trial court had incorrectly granted a directed verdict in favor of the defendants on the plaintiffs' claim for civil conspiracy. On appeal, the plaintiffs argued that they had presented sufficient evidence on all elements of civil conspiracy to allow the matter to be decided by the jury. In discussing the meaning of the element "resulting in actual damages," this Court stated:

> Some Ohio cases have held that a plaintiff must allege and prove damages attributable to the conspiracy that are above and beyond those resulting from any underlying or supporting torts. These holdings, however, were based on a misreading of *Minarik*. It is stated in *Minarik* that any damages must be "directly

---

[1] Although our holding in Phoenix's assignment of error two below recognizes that a claim for conspiracy to misappropriate trade secrets is displaced by the Ohio UTSA, DCO did not raise the issue below nor does DCO raise this issue on appeal. Indeed, a review of DCO's proposed jury instructions shows that DCO proposed a separate instruction for Phoenix's claim for civil conspiracy to misappropriate trade secrets. Accordingly, our review is limited to the issues DCO has chosen to raise in its respective assignments of error. *See Bank of America, N.A. v. Edwards*, 9th Dist. Lorain Nos. 15CA010848, 15CA010851, 2017-Ohio-4343, ¶ 8.

attributable" to the conspiracy. In the context of that case, however, that statement did not mean the damages had to be attributable only to the conspiracy to the exclusion of the underlying tort. It meant that damages, in order to be recoverable under a civil conspiracy claim, cannot be the result of just any tort committed by a conspirator, or just any act committed in furtherance of the conspiracy. They must have been caused by a tort committed in furtherance of the conspiracy. Essentially, this simply restricts the measure of recovery for a conspiracy claim to those damages caused by the underlying tort (or torts) necessary to support the claim for civil conspiracy in the first place.

This is borne out by another passage in Minarik. The court quoted a passage from Cooley on Torts that the significance of the conspiracy claim is not damages caused by the conspiracy alone, but rather additional pockets from which to collect damages, and a possible increase in those damages[.]

(Internal citations omitted.) *Id.* at 220-221. Moreover, this Court subsequently concluded that "[a] civil conspiracy claim, therefore, serves only to enlarge the pool of potential defendants from whom a plaintiff may recover damages and, *possibly, an increase in the amount of those damages*; it does not increase the plaintiff's burden by requiring proof of additional damages." (Emphasis added.) *Id.* at 221.

**{¶47}** "It is fundamental that a plaintiff cannot recover twice on the same incident." *Telxon Corp. v. Smart Media of Delaware, Inc.*, 9th Dist. Summit Nos. 22098, 22099, 2005-Ohio-4931, ¶ 97, citing *P.C. & S.L. R.R. Co. v. Hedges*, 41 Ohio St. 233, 233-34 (1884). In this case, however, Phoenix argued at trial that its entire business was destroyed. This Court has specifically stated, "'[w]hen an entire business is wrongfully interrupted and injured,' as [Phoenix] alleged here, 'the measure of damages is the decrease in volume traceable to the wrong, as reflected by loss of profits, expenses incurred or similar concrete evidences of injury.'" *World Metals, Inc. v. AGA Gas, Inc.*, 142 Ohio App.3d 283, 288 (9th Dist.2001), quoting *Guntert v. Stockton*, 55 Cal.App.3d 131, 143 (1976). Phoenix's expert, Mr. Zeleznik, estimated the value of Phoenix in December 2008 to be a little bit over $1.35 million, falling to $46,670.00 by March 2009. Consequently, Mr. Zeleznik opined that Phoenix's damages were

about $1,315,000.00. However, Mr. Zeleznik also stated that he had used several different approaches to determine the value of Phoenix at the end of 2008. One of those methods calculated Phoenix's business to be worth $1,549,000.00. Additionally, Phoenix introduced as evidence valuations its CPA had prepared during negotiations with Brown and Day for the purchase of Phoenix. Those estimates calculated Phoenix's value as of December 31, 2007, as between $1.7 million and $2.4 million.

{¶48} When the possibility exists that a jury could, in finding for a plaintiff on multiple claims, award duplicate damages for the same pecuniary injury, the jury should at a minimum be cautioned that such an award is improper. *Titanium Industries v. S.E.A., Inc.*, 118 Ohio App.3d 39, 52, (7th Dist.1997). As to damages, the jury in this case was instructed, in pertinent part, as follows:

> If you find for Phoenix on one or more of its claims, you will separately determine by a preponderance of the evidence, the amount of money that will reasonably compensate Phoenix for damages proximately caused by the wrongful act(s)
>
> *You should be cautious in consideration of damages not to overlap or duplicate the amounts of your award, which would result in double damages.* For instance, an award, if granted, for unfair competition should relate to that claim only and should not include compensation for a different claim such as misappropriation of a trade secret.
>
> * * *
>
> COMPENSATORY DAMAGES
>
> You must determine what monetary amount of damages, if any, will reasonably compensate Phoenix for the damages it incurred by reason of the causes of action or claims that it has successfully proven. You will set forth this amount as an award of "compensatory damages."
>
> Phoenix's position is that DCO's actions caused a loss of its business value. Where a regularly established business is wrongfully injured, interrupted, or destroyed, the business may recover the damages sustained by ascertaining how

much less valuable the business was by reason of the interruption or destruction and to allow that amount as damages.

* * *

Therefore, if you have found DCO has acted wrongfully either directly or as a part of a conspiracy, you must decide what the value of Phoenix's business was before DCO's wrongful conduct and what the value of it became after DCO's wrongful act. The difference will be the damages that Phoenix is owed.

(Emphasis added.) We note that DCO has not challenged these instructions on appeal. Accordingly, as a jury is presumed to have followed the trial court's instruction, we cannot say that the jury awarded double damages in this case. *See State v. Knight*, 9th Dist. Wayne No. 15AP0019, 2016-Ohio-8505, ¶ 9 (recognizing that a "jury is presumed to have followed the trial court's instruction."). The verdict in this case can be construed as representative of the jury's belief that Phoenix was entitled to a total compensatory damage amount of $1,680,970.00 and that the jury merely allocated that award among Phoenix's various theories of recovery.

**{¶49}** Therefore, DCO's fourth assignment of error is overruled.

### DCO's Assignment of Error I

**The trial court erred by failing to rule that Plaintiff caused its own damages, and by improperly excluding evidence that it did not suffer damages because the consolidation of Phoenix with JDA fully mitigated any harm that Defendants allegedly caused, or that Phoenix as a matter of law failed to mitigate damages.**

**{¶50}** In its first assignment of error, DCO contends that the trial court erred by not concluding as a matter of law that Phoenix caused its own damages and by excluding DCO's evidence and expert testimony regarding the consolidation of Phoenix into JDA. We disagree on both points.

### A. Evidence of Causation

**{¶51}** DCO also argues in its first assignment of error that the trial court erred by not finding that Phoenix had failed to offer sufficient proof of causation and that the evidence

demonstrated that the only damages suffered by Phoenix were caused by Duffy's decision to consolidate Phoenix and JDA. Nonetheless, our resolution of DCO's second, third, and fourth assignments of error render this argument moot and we decline to address it. *See* App.R. 12(A)(1)(c).

## B. Exclusion of Evidence

**{¶52}** DCO contends on appeal that the trial court erred by excluding DCO's expert evidence regarding the consolidation of Phoenix and JDA. Although the trial court allowed extensive testimony regarding the consolidation, DCO argues that it should have been allowed to present additional evidence that: (1) Duffy hired two experienced individuals to work for JDA who had inquired about employment with Phoenix; (2) JDA's revenue increased by roughly the same amount that was previously earned by Phoenix; (3) JDA did not pay any value for Phoenix; and (4) JDA took over Phoenix's accounts, projects, customers, territory, and employees. DCO argues that if it had been able to present this evidence, it would have been able to show that Phoenix could have remained viable, or alternatively that no damages were suffered by virtue of the consolidation or if there were damages, that Phoenix failed to mitigate those damages.

**{¶53}** Trial courts are "'vested with broad discretion'" with regard to the admission or exclusion of evidence, "'and an appellate court should not interfere absent a clear abuse of that discretion.'" *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 40, quoting *State v. Allen*, 73 Ohio St.3d 626, 633 (1995). An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219. When reviewing for an abuse of discretion, an appellate court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

**{¶54}** Evid.R. 402 limits the admission of evidence to relevant evidence. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Phoenix filed a motion in limine prior to trial to exclude evidence of JDA's financial information as irrelevant because Phoenix and JDA are separate legal entities. The trial court initially determined that JDA's financial information "may be relevant" and denied Phoenix's motion. However, the trial court cautioned trial counsel that after hearing the evidence, the trial court could decide the information was not relevant and exclude it. Just as the trial court had warned, after hearing a significant amount of testimony, the court ultimately determined that JDA's worth or how it may have benefited by the events alleged in the complaint were not relevant to the issue of Phoenix's damages in this case. The trial court specifically recognized that "[Phoenix] is the corporation that is suing, and it is the value of [Phoenix] that is at issue in this case."

**{¶55}** Nonetheless, the trial court specifically acknowledged that DCO was "free to defend this case by proving that [Phoenix] has a lot of value and therefore there's no damage" and that DCO could "attack the issue of causation of the alleged damages [of Phoenix]." Indeed, DCO's expert testified that Phoenix failed to mitigate its damages because: (1) "Phoenix Lighting could have been saved as a whole;" (2) "the business could have been sold" because "there was value there;" and (3) "the assets of [Phoenix] could have been sold for fair value." These assets include the tangible assets such as physical equipment as well as the account numbers and customers of Phoenix who were "migrated" to JDA since they were "revenue-producing." DCO was also able to elicit testimony regarding Duffy's prior contemplation to consolidate Phoenix and JDA from Duffy and multiple former employees of Phoenix.

{¶56} Therefore, we conclude that the trial court did not abuse its discretion in excluding evidence that related to JDA's worth and in what way it may have ultimately benefited from the actions alleged in complaint.

{¶57} Accordingly, DCO's first assignment of error is overruled.

### DCO's Assignment of Error V

**The trial court erred by awarding compensatory damages in an amount greater than Plaintiff admitted it could prove and by failing to remit the compensatory and punitive damages awards.**

{¶58} In its fifth assignment of error, DCO contends that there was insufficient evidence to support the compensatory damages awarded in this case and that this "Court should order the trial court to remit the compensatory and punitive damages amounts and reconsider its attorneys' fees award." We disagree.

{¶59} In this case, the jury awarded Phoenix an aggregate award of $1,680,970.00 in compensatory damages. Following the jury's verdict, DCO filed a motion for judgment notwithstanding the verdict, or in the alternative, motion for new trial or motion for remittitur. DCO's alternative motion for new trial or remittitur argued in part that the trial court erred when it "[e]ntered judgment against DCO in an amount greater than Plaintiffs' counsel said he could prove at closing and was not supported by the evidence." The trial court summarily denied DCO's motion.

{¶60} Civ.R. 59(A)(4) states that "[a] new trial may be granted * * * on all or part of the issues upon * * * [e]xcessive or inadequate damages, appearing to have been given under the influence of passion or prejudice." "In Ohio, it has long been held that the assessment of damages is so thoroughly within the province of the jury that a reviewing court is not at liberty to disturb the jury's assessment absent an affirmative finding of passion and prejudice *or* a finding

that the award is manifestly excessive." (Emphasis sic.) *Moskovitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St.3d 638, 655 (1994).

**{¶61}** The grant or denial of a motion for a new trial on the ground of excessive damages rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *Pena v. Northeast Ohio Emergency Affiliates, Inc.*, 108 Ohio App.3d 96, 103 (9th Dist.1995). An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore*, 5 Ohio St.3d at 219. "'An appellate court reviewing whether a trial court abused its discretion on a motion for a new trial pursuant to Civ.R. 59(A)(4) must consider (1) the amount of the verdict, and (2) whether the jury considered improper evidence, improper argument by counsel, or other inappropriate conduct which had an influence on the jury.'" *Dragway 42, L.L.C. v. Kokosing Constr. Co., Inc.*, 9th Dist. Wayne No. 09CA0073, 2010-Ohio-4657, ¶ 35, quoting *Pena* at 104. "To support a finding of passion or prejudice, it must be demonstrated that the jury's assessment of the damages was so overwhelmingly disproportionate as to shock reasonable sensibilities." *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, at ¶ 20. Nonetheless, when applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. *Pons*, 66 Ohio St.3d 619 at 621.

**{¶62}** On appeal, DCO argues that the compensatory damages award was excessive in this case because it was above the amount of damages calculated by Phoenix's expert. However, after a review of the testimony and evidence presented at trial, we cannot say the jury's award is so overwhelmingly disproportionate that is shocks reasonable sensibilities. Phoenix's expert, Mr. Zeleznik, estimated the value of Phoenix in December 2008 to be a little bit over $1.35 million, falling to $46,670.00 by March 2009. Consequently, Mr. Zeleznik opined that

Phoenix's damages were about $1,315,000.00. However, Mr. Zeleznik also stated that he had used several different approaches to determine the value of Phoenix at the end of 2008. One of those methods had calculated Phoenix's business to be worth $1,549,000.00. Additionally, Phoenix introduced as evidence valuations its CPA had prepared during negotiations with Brown and Day for the purchase of Phoenix. Those estimates calculated Phoenix's value as of December 31, 2007, as between $1.7 million and $2.4 million. Phoenix also submitted evidence that Brown and Day first contacted DCO in late summer 2008 and that the majority of Phoenix's employees were told during a closed door meeting at that time that Brown and Day were approaching another manufacturer to sponsor them to start a new agency.

{¶63} DCO also contends that Phoenix's trial counsel made statements during closing argument that amount to a judicial admission and thus, the trial court could not award damages in excess of $1.4 million. During closing argument, Phoenix's trial counsel made the following statement with regard it's expert witness' valuation of Phoenix:

> Regarding damages, Mr. Zeleznik estimated the value of this business before and after immediately before the tortious conduct and immediately after, and it's $1,315,000.00.
>
> Mr. Duffy, he felt when he was negotiating with Mr. Brown and [Mr.] Day[,] he checked and he believed it's one times revenue. The revenue in 2008 was $1.4 million, so the number is somewhere between $1.35 million and/or $1.4 million.
>
> The law, unfortunately, limits us to that value. * * * It doesn't allow us to speculate as to what could have been. We are stuck with that number. That's our limit, either the $1.315 or else the $1.4 million.

{¶64} "A judicial admission is a 'formal statement, made by a party or party's counsel in a judicial proceeding, that act[s] as a substitute for legal evidence at trial.'" *Williams v. Williams*, 12th Dist. Warren No. CA2012-08-074, 2013-Ohio-3318, ¶ 12, quoting *Haney v. Law*, 1st Dist. Hamilton No. C070313, 2008-Ohio-1843, ¶ 7. In support of its argument, DCO cites

*Hake v. George Wiedemann Brewing Co.*, 23 Ohio St.2d 65 (1970), for the proposition that trial counsel's statement during closing argument can be a judicial admission. In *Hake*, the defendant's trial counsel admitted acts by plaintiff's employee during opening argument that the Supreme Court of Ohio determined were sufficient to establish an element of the plaintiff's cause of action. Nonetheless, such a statement will only be binding where there is indication that the statement was intended to dispense with formal proof of material facts for which witnesses would otherwise be called at trial. *See Holeski v. Lawrence*, 85 Ohio App.3d 824, 833 (11th Dist.1993), citing *Harrison Constr. Co. v. Ohio Turnpike Comm.* 316 F.2d. 174, 177 (6th Cir.1963). Moreover, "such a statement, to be operative as an admission, must be one of 'fact' and not merely a statement of a legal conclusion." *Faxon Hills Const. Co. v. United Broth. of Carpenters and Joiners of America*, 168 Ohio St. 8, 10-11 (1958). As such, we determine that Phoenix's trial counsel's statement did not constitute a judicial admission.

{¶65} Therefore, we conclude that the trial court did not abuse its discretion when it denied DCO's motion for a new trial or remittitur. Accordingly, DCO's fifth assignment of error is overruled.

### DCO's Assignment of Error VI

**The trial court erred by applying a 2x multiplier to the attorney's fees award, which shocks the conscience and is unsupported by Ohio law.**

{¶66} In its sixth assignment of error, DCO contends that the trial court erred when it applied a multiplier of two to the award of attorney fees.

{¶67} Following a punitive damages hearing, the jury determined that Phoenix was entitled to reasonable attorney fees. The trial court subsequently held a hearing on the issue and determined that a lodestar calculation of $1,991,507.00 accurately represented the amount of attorney fees that would have been charged to Phoenix. The trial court further determined that

considering all the relevant factors pursuant to Ohio Prof. Cond. Rule 1.5(a)(1)-(8), Phoenix's overall success, and the detailed and lengthy procedural records of the case that Phoenix was entitled to an enhancement of the lodestar amount by a multiplier of two. Accordingly, the trial court awarded a total attorney fee amount of $3,983,014.00.

{¶68} A trial court's award of attorney fees is reviewed for an abuse of discretion. *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 146 (1991). An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary[,] or unconscionable." *Blakemore*, 5 Ohio St.3d at 219. When reviewing for an abuse of discretion, an appellate court may not substitute its judgment for that of the trial court. *Pons*, 66 Ohio St.3d at 621.

{¶69} As required under the lodestar method, the court first calculated the number of hours reasonably expended on this case times a reasonable hourly fee. *See Bittner* at 145. After calculating this lodestar amount, "[t]he next step is to raise or lower the lodestar based upon factors that may include:

> the time and labor involved in maintaining the litigation; the novelty and difficulty of the questions involved; the professional skill required to perform the necessary legal services; the attorney's inability to accept other cases; the fee customarily charged; the amount involved and the results obtained; any necessary time limitations; the nature and length of the attorney/client relationship; the experience, reputation, and ability of the attorney; and whether the fee is fixed or contingent.

*Welch v. Prompt Recovery Servs., Inc.*, 9th Dist. Summit No. 27175, 2015-Ohio-3867, ¶ 21, quoting *Bittner* at 145-146.

{¶70} In determining that Phoenix was entitled to a multiplier of two times the lodestar amount, the trial court considered "the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly." In so considering, the trial court determined that the case was complex, both factually and legally, and

that the litigation involved the prosecution of nine claims and the defense of counterclaims through "numerous dispositive and procedural motions" and a lengthy trial. The trial court also considered that: (1) due to the complexity of this case, Phoenix's attorneys were hindered and/or precluded from accepting and pursuing other cases and clients; (2) Phoenix obtained a highly favorable outcome, prevailing on the majority of its claims; (3) Phoenix's counsel was forced to assume a great financial risk when the litigation became financially overwhelming; and (4) that all of the attorneys involved in this case were of high caliber, highly experienced, and maintained excellent reputations.

**{¶71}** Accordingly, we cannot say that the trial court abused its discretion in applying a multiplier of two to the lodestar amount in this case. Therefore, DCO's sixth assignment of error is overruled.

**DCO's Assignment of Error VII**

**Judgment against DCO was against the manifest weight of the evidence.**

**{¶72}** In its seventh assignment of error, DCO contends that the judgment was against the manifest weight of the evidence. However, DCO fails to conduct any analysis of its argument. Pursuant to App.R. 16(A)(7), the brief of an appellant shall include "[a]n argument containing the contentions of the appellant * * * and the reasons in support of the contentions[.]" "Where an appellant fails to develop an argument in support of [its] assignment of error, we will decline to do so for [it]." (Internal quotation omitted.) *State v. Powell*, 9th Dist. Summit No. 28170, 2017-Ohio-5629, ¶ 22. "If an argument exists that can support [an] assignment of error, it is not this [C]ourt's duty to root it out." *Cardone v. Cardone*, 9th Dist. Summit Nos. 18349 and 18673, 1998 Ohio App. LEXIS 2028, *22 (May 6, 1998).

**{¶73}** Therefore, DCO's seventh assignment of error is overruled.

**Phoenix's Assignment of Error I**

**The trial court erroneously interpreted the punitive damages cap for direct misappropriation of trade secrets [R.C. § 1333.63(B)] as a treble damages statute, thus potentially precluding Phoenix from receiving up to an additional $300,000 of punitive damages.**

**{¶74}** In its first assignment of error, Phoenix contends that the trial court erroneously interpreted R.C. 1333.63(B) as a treble damages statute, thus potentially precluding Phoenix from receiving up to an additional $300,000.00. We disagree.

**{¶75}** Following a punitive damages hearing, the trial court awarded punitive damages as to the misappropriation of trade secrets claim, specifically stating, "As to the Misappropriation of Trade Secrets claim the [c]ourt hereby awards punitive damages on such claim and trebles the $300,000.00 in compensatory damages the jury awarded to a total of $900,000.00 on that claim." Thereafter, Phoenix filed a motion for reconsideration requesting the trial court to reconsider its calculation method and award an additional $300,000.00 in punitive damages relating to the misappropriation of trade secrets claim. The trial court summarily denied Phoenix's motion to reconsider.

**{¶76}** "Punitive damages are not meant to compensate an injured party. Rather, punitive damages are awarded for the purpose of punishing and deterring certain conduct." (Internal citations omitted.) *Desai v. Franklin*, 177 Ohio App.3d 679, 2008-Ohio-3957, ¶ 40 (9th Dist.). R.C. 1333.63(A) allows an aggrieved party to recover damages for the misappropriation of a trade secret. Additionally, R.C. 1333.63(B) allows a trial court to impose punitive damages in the case of a willful and malicious misappropriation of trade secrets. That statute specifically provides, "[i]f willful and malicious misappropriation exists, the court may award punitive or exemplary damages in an amount not exceeding three times any award made under [R.C. 1333.63(A)]." In light of the "may award" language used, "the decision whether to award

punitive damages * * * rests within the trial court's discretion, and its decision will not be reversed on appeal absent an abuse thereof." *InfoCision Mgt. Corp v. Donor Car Center, Inc.*, 9th Dist. Summit No. 27034, 2016-Ohio-789, ¶ 33, citing *Becker Equip. Inc., v. Flynn*, 12th Dist. Butler No. CA2002-12-313, 2004-Ohio-1190, ¶ 11. An abuse of discretion requires more than an error in judgment, rather it "implies that the court's attitude is unreasonable, arbitrary[,] or unconscionable." *Blakemore*, 5 Ohio St.3d at 219.

**{¶77}** In this case, nothing in the trial court's journal entry suggests that the trial court believed it was restricted to awarding no more than treble damages on Phoenix's misappropriation of trade secrets claim rather than awarding punitive damages in an amount up to three times the compensatory damages. The fact that the trial court used the word "trebles" and did not award the maximum allowed by the statute is not enough to infer that the trial court misinterpreted the statute. Indeed, "[t]he focus of the award should be the defendant, and the consideration should be what it will take to bring about the twin aims of punishment and deterrence as to that defendant" and the "award should not go beyond what is necessary to achieve its goals." *Dardinger v. Anthem Blue Cross & Blue Shield*, 98 Ohio St.3d 77, 2002-Ohio-7113, ¶ 178. After a review of the record, we cannot say that the trial court abused its discretion when it trebled its award of compensatory damages to calculate the punitive damages it awarded to Phoenix for DCO's misappropriation of its trade secrets.

**{¶78}** Therefore, Phoenix's first assignment of error is overruled.

### Phoenix's Assignment of Error II

**The trial court erroneously applied the R.C. § 2315.21(D) punitive damage cap instead of the R.C. § 1333.63(B) punitive damages cap to the jury's award for punitive damages on the conspiracy to maliciously misappropriate trade secrets, thus improperly "capping off" $203,000 of the jury's punitive damages award.**

**{¶79}** In its second assignment of error, Phoenix contends that the trial court erroneously applied the punitive damage cap of R.C. 2315.21(D) instead of the punitive damages cap of R.C. 1333.63(B) to Phoenix's claim for conspiracy to maliciously misappropriate trade secrets. We agree.

**{¶80}** R.C. 1333.67(A) states that Ohio's Uniform Trade Secrets Act ("OUTSA") "displace(s) conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." "This language was intended to prevent inconsistent theories of relief for the same underlying harm and has been interpreted to bar claims that are based solely on allegations of misappropriation of trade secrets or other confidential information." *Rogers Indus. Prods. Inc. v. HF Rubber Mach., Inc.*, 188 Ohio App.3d 570, 2010-Ohio-3388, ¶ 29 (9th Dist.), citing *Glasstech, Inc. v. TGL Tepmering Sys., Inc.*, 50 F.Supp.2d 722, 730 (N.D.Ohio.1999). Accordingly, "'[P]laintiffs alleging theft or misuse of their ideas, data, or other commercially valuable information are confined to the single cause of action provided by the [O]UTSA.'" *Id.* quoting *Hauck Mfg. Co. v. Astec Industries, Inc.*, 375 F.Supp.2d 649, 659 (E.D.Tenn.2004). The Ohio UTSA statute does not affect "[o]ther civil remedies that are not based on misappropriation of a trade secret." R.C. 1333.67(B)(2).

**{¶81}** However, "[t]he precise scope of the preemption clause has not been interpreted uniformly across UTSA jurisdictions. And, unfortunately, '[t]he Ohio Supreme Court has yet to speak to the scope of the OUTSA's preemption clause.'" (Internal citations omitted.) *Stolle Machinery Co., LLC v. RAM Precision Industries*, 605 Fed.Appx. 473, 484 (6th Cir.2015), quoting *Office Depot, Inc. v. Impact Office Prods., LLC*, 821 F.Supp.2d 912, 919 (N.D.Ohio 2011). Nonetheless, courts applying OUTSA generally seem to have subscribed to the majority rule that the statute should be broadly interpreted so as to abolish all other causes of action for

theft, misuse, or misappropriation of any confidential or secret information. *Id.* citing *Office Depot* at 918-919 (citing *Allied Erecting and Dismantling Co. v. Genesis Equip. & Mfg.*, 649 F.Supp.2d 702, 720 (N.D.Ohio 2009) and *Rogers Indus. Prods. Inc.* at ¶ 29. ("This language was intended to prevent inconsistent theories of relief for the same underlying harm and has been interpreted to bar claims that are based solely on allegations of misappropriation of trade secrets or other confidential information.")

{¶82} Accordingly, we conclude that damages relating to a claim for civil conspiracy to misappropriate trade secrets are governed by OUTSA and, thus, the punitive damages cap in R.C. 1333.63 is applicable this matter.

{¶83} Therefore, Phoenix's second assignment of error is sustained. The trial court's journal entry is hereby reversed as it pertains to the punitive damages cap for the claim of civil conspiracy to misappropriate trade secrets and this matter is remanded for the trial court to apply R.C. 1333.63.

### III.

{¶84} DCO's first, second, third, fourth, fifth, sixth, and seventh assignments of error are overruled. Phoenix's first assignment of error is overruled. Phoenix's second assignment of error is sustained. Therefore, the judgment of the Summit County Court of Common Pleas is affirmed in part, reversed in part, and this matter is remanded for further proceedings consistent with this opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Defendant-Appellant/Cross-Appellee, Genlyte Thomas Group, L.L.C..

 

 

JULIE A. SCHAFER
FOR THE COURT

 

CALLAHAN, J.
CONCURS.

CARR, J.
DISSENTING.

{¶85} I respectfully dissent from the judgment of the majority as I would sustain a portion of DCO's first assignment of error and remand the matter for a new trial.

{¶86} In the first assignment of error, DCO has argued that the trial court erred in excluding expert evidence related to the consolidation of Phoenix/LSI into JDA. Prior to DCO's expert's testimony, the trial court specifically instructed the expert about the areas of permitted and prohibited testimony. The trial court stated:

[T]he defense has been limited to talk about – they certainly can criticize [Phoenix/LSI's expert's] valuation through cross-examination of [him], his valuation of the corporation at one point, $3.4 million, and the process that he went through to determine that valuation.

And they can also criticize the lack of mitigation on Mr. Duffy's part, Phoenix's part in failing to hire anybody for Phoenix specifically.

But I'm not going to permit you to talk about how much money the combined offices made and how that compares to what Phoenix made prior.

So your charts in [the expert report] are not going to come in. Basically when you discuss Section A under the analysis, that beginning part you talk about how [Phoenix/LSI's expert] has failed to identify any specific actions or inactions of any defendants on behalf of Phoenix, you can talk about that as that relates to Phoenix, not JDA. You're not including JDA in any of that.

So you're basically saying that he failed to show any causation in his – I don't know that you're necessarily alleging that that's [Phoenix/LSI's expert] as much as plaintiffs aren't showing any causation here.

But as to Section A, merger of Phoenix and JDA, from there on none of that is going to be permitted. Combined section B, combined Phoenix/JDA sales and income, none of that's going to be permitted, which I realize is the bulk of your report.

So it will be question-by-question deposition. If there are objections, you have to wait till the Court rules on the objection.

The main point I want to make to you is even if [counsel] asks an open-ended question that doesn't suggest an answer, which he shouldn't because you're his witness, they should be open-ended questions. You cannot on your own bring in information about events that occurred after April 17 of 2009 or you'd be in violation of the Court's order.

Thus, DCO's expert was prohibited from testifying about most of the contents of his report. Part of DCO's argument concerning Phoenix/LSI's damages was that DCO's actions did not cause Phoenix/LSI's damages. In support of this, DCO's expert's report pointed to two main areas: (1) evidence that the consolidation was contemplated by Mr. Duffy prior to February 2009; and (2) evidence of the downturn in the economy in 2009.

**{¶87}** With respect to the consolidation, it appears that the trial court viewed the evidence concerning JDA's post-consolidation condition as being irrelevant because it was the value of Phoenix/LSI that was primarily at issue in terms of the *amount* of damages. This, however, ignores the fact that the post-consolidation condition of JDA, which by 2010, in terms of sales, appeared to be very similar to the combined status of Phoenix/LSI and JDA in 2008, could provide circumstantial evidence in support of the notion that the consolidation was a planned event and not an emergency measure taken because of DCO's actions. Thus, the evidence of what Mr. Duffy did with Phoenix/LSI and JDA around the time of the consolidation could be relevant to whether Phoenix/LSI's damages were caused by DCO. To the extent that testimony and evidence could have been misused or misinterpreted by the jury, the trial court could have supplied a limiting instruction instead of excluding the evidence.

**{¶88}** While the majority ultimately concludes that the trial court did not abuse its discretion in excluding the evidence on the basis of lack of relevancy, the majority does not expressly state that the evidence was irrelevant. Instead, the majority seems to engage in somewhat of a harmless error analysis, focusing on the evidence that was admitted. While I agree that DCO was permitted to present some evidence related to Phoenix/LSI's failure to mitigate and evidence demonstrating the prior contemplation of the consolidation, DCO's expert was prohibited from presenting a substantial amount of information contained in his expert report. In fact, DCO's expert's entire testimony totaled fewer than 30 pages. This trial was not a simple, straightforward matter. Even though the jury heard that the consolidation may have been contemplated before February 2009, it was not allowed to hear an expert's opinion of why that fact would matter in terms of the causation of Phoenix/LSI's damages or to hear evidence that could buttress the idea that the consolidation was planned. Therefore, I cannot conclude that the

exclusion of that evidence was harmless. Accordingly, I would sustain the relevant portion of

DCO's first assignment of error and remand the matter for a new trial.

APPEARANCES:

BRUCE J. L. LOWE, JULIE A. CROCKER, JOHN B. NALBANDIAN, and AARON M. HERZIG, Attorneys at Law, for Appellant/Cross-Appellee.

JEFFREY T. WITSCHEY and BETSY L. B. HARTSCHUH, Attorneys at Law, for Appellee/Cross-Appellant.